UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CONSUMER FINANCIAL PROTECTION
BUREAU,

        PLAINTIFF,

v.

BORDERS & BORDERS, PLC, et al.

        DEFENDANTS.

CIVIL ACTION NO. 3:13-CV-1047-H

## DEFENDANTS' MEMORANDUM IN SUPPORT
## OF MOTION TO LIMIT DISCOVERY

     Defendants, Borders & Borders, PLC, Harry Borders, John Borders, Jr., and J. David

Borders (collectively referred to as the "Borders"), by counsel, respectfully move this Court to

issue an order limiting preliminary discovery in this action to the specific criteria that will

establish whether the Borders are eligible for the statutory safe harbor created by Congress in 12

U.S.C. § 2607(c)(4) and confirmed last November by the United States Court of Appeals for the

Sixth Circuit.  *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722 (6th Cir. 2013).  The relevant

factors qualifying an affiliated business arrangement for the statutory safe harbor are: (a) whether

disclosure of the existence of the affiliated business arrangement and an estimate of the cost of

the settlement service is made to the consumer; (b) whether the consumer is permitted to select

an alternative settlement service provider; and (c) whether the only thing of value received from

the arrangement is a return on ownership interest.  12 U.S.C. § 2607(c)(4); *Carter*, 736 F. 3d. at

725, 728.

     The Borders long ago provided the information necessary to make these determinations.

However, the plaintiff, the Consumer Financial Protection Bureau ("CFPB"), has propounded

burdensome and expensive discovery requests that extend well beyond pertinent, threshold questions addressing the statutory safe harbor, and reveal an enforcement agenda that intends to circumvent the Sixth Circuit's ruling in *Carter*.  Moreover, the CFPB is already serving subpoenas upon numerous third parties, demanding extensive and burdensome information, far beyond the threshold issues.

Whether the Borders qualify for the statutory safe harbor for affiliated business arrangements is a dispositive issue, and one that the Borders believe will resolve this case without the burdensome, expensive and coercive discovery CFPB proposes.  Therefore, the Court should in its broad discretion limit the scope of initial discovery to information pertinent to whether the Borders are eligible for this protection.  Further, the Borders respectfully ask the Court to limit discovery to the real estate closings occurring on or after October 24, 2009, in accordance with the applicable three-year statute of limitations, 12 U.S.C. § 2614 (which was extended one year at CFPB's request, pursuant to a tolling agreement dated October 24, 2012).

## BACKGROUND

A.      **The Parties.**

Defendant Borders & Borders, PLC is a small, family-owned law firm that primarily performs residential real estate closings in Louisville.  It was established by J. David Borders in 1971, and today his two sons, Harry Borders and John Borders, Jr., manage and operate the firm.

The CFPB, created by the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), Pub. L. No. 111-203, 124 Stat. 1376 (2010), took over enforcement of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 *et seq.* on July 21, 2011.  *See Carter*, 736 F.3d at 725 (citing 12 U.S.C. § 2617).

B.      **The CFPB's Investigation.**

In 2011, the United States Department of Housing and Urban Development ("HUD")
requested information from Borders & Borders  concerning its use of affiliated business
arrangements in connection with residential closings.  Specifically, HUD sought information
concerning nine Kentucky limited liability companies that operated as title agencies for the
purpose of performing post-closing title services, including the issuance of title insurance.  These
companies are identified in paragraph  9 of the Complaint, and generally referred to in this
matter as the "Title LLCs."[1] (Docket Entry ("DE") 1; Answer (DE 5) ¶ 9).

The Borders complied fully with HUD's investigation and provided the agency with full
explanations concerning the Title LLCs and their operations, as well as thousands of documents
and correspondence spanning as far back as 2006.  When the Borders learned in early 2011 that
HUD had questions concerning the affiliated business arrangements, they ceased operation of the
Title LLCs until compliance with applicable law could be confirmed.  Since that time, the
Borders have not resumed the business of the Title LLCs, despite their firm belief that all
operations were authorized by the affiliated business arrangements provisions of  RESPA, 12
U.S.C. § 2607(c)(4).  (DE 1 ¶ 26, DE 5 ¶ 25).

After submitting their full explanation to HUD in April 2011, with the assistance of
former HUD enforcement counsel now in private practice, the Borders heard nothing from the
government for over one year.  During the interim, the CFPB assumed responsibility for
enforcement of RESPA from HUD, in accordance with the Dodd-Frank Act.  *See Carter*, 736
F.3d at 725.  After the CFPB became involved, it asked Borders & Borders (but not the

---

[1]The following make up the Title LLCs: (1) Associate Home Title, LLC; (2) Catalyst Title, LLC, (3) East Title,
LLC; (4) KMT Title, LLC; (5) Leo Title Services, LLC; (6) My Kentucky Home Title, LLC; (7) Opia Title, LLC;
(8) TBD Title, LLC; and (9) WS Title, LLC.  (*Id.*)

individual Borders defendants) to execute a tolling agreement to toll the running of the three-year statute of limitations for alleged RESPA violations, § 2614.  Borders & Borders signed the tolling agreement effective for six months beginning October 24, 2012.   At CFPB's request, the agreement was renewed for another six months effective April 24, 2013.  The statute of limitations expired for any claims related to closings or distributions prior to October 24, 2009, but the agreement tolled the limitations period against Borders & Borders only while they continued to discuss this matter with the CFPB.

**C.     The CFPB's Complaint For Injunctive Relief And Disgorgement.**

On October 24, 2013, the CFPB filed this action alleging a violation of Section 8(a) of RESPA, § 2607(a).  The CFPB contends that from 2006 until 2011, the Borders "entered into and operated nine [Title LLCs] with several owners and managers of local real estate and brokerage companies."  (DE 1, ¶ 9.)  The CFPB collectively refers to the "owners and managers" as joint venture partners (the "JVPs").  (*Id.*)  The CFPB alleges that Borders utilized the Title LLC's to pay illegal kickbacks to JVPs in exchange for settlement services referrals, violating RESPA's prohibition on such exchanges.  (DE 1, ¶ 29.)

The Borders reject the CFPB's allegations and maintain that they organized the Title LLCs in accordance with § 2607(c)(4), which provides that "[n]othing in this section shall be construed as prohibiting . . . affiliated business arrangements."  As explained by the Sixth Circuit in *Carter*, which was issued one month after the CFPB filed this action, an affiliated business arrangement is covered by the safe harbor of § 2607(c)(4) if it meets three conditions: "(1) The person making the referral must disclose the arrangement to the client; (2) the client must remain free to reject the referral; and (3) the person making the referral cannot receive any 'thing of value from the arrangement' other than 'a return on the ownership interest or franchise relationship.'"  736 F.3d at 725 (quoting § 2607(c)(4)).

In paragraph 30 of its Complaint, the CFPB acknowledges the safe harbor for affiliated business arrangements provided by § 2607(c)(4), but it asserts that the Borders are not entitled to this protection because, according to the CFPB, the Title LLC's were not "*bona fide* 'providers of settlement services' within the meaning of RESPA"  (emphasis added).  Similarly, the CFPB contends that payments made from the Title LLCs to the Borders and the JVPs "did not constitute *bona fide* returns of ownership interest."  (*Id.* (emphasis added)).  Finally, the CFPB asserts that the Borders are not entitled to safe harbor protection because the AfBA Disclosures that the Borders "provided to referred customers did not conform to 12 C.F.R. Part 1024, Appendix D, represent a threat to the basic purpose of the disclosure, and were not provided at the time of the referral."  (DE 1 ¶30).

Notably, the CFPB does not allege that any borrowers (*i.e.* consumers) at the several hundred closings conducted by the Borders firm within the relevant time period were harmed in any manner whatsoever.  The CFPB cannot, and does not, contend that any borrower was overcharged for title insurance at any closing, failed to receive the title insurance product for which they bargained, or received an inferior title insurance product.  Nonetheless, and despite the fact that there is no ongoing conduct that could be stopped since the Title LLCs ceased operations in 2011, the CFPB seeks a permanent injunction to stop "future violations of Section 8 of RESPA."  (DE 1 ¶ 32(a)).  The CFPB further seeks disgorgement of all revenue received by the Borders in connection with the real estate closings at issue, despite the fact that its enforcement remedy is limited to an injunction under § 2607(d)(4), and the fact that, in addition to providing the safe harbor for affiliated business arrangements, the statute expressly protects payment of a fee to attorneys at law for services actually rendered.  *See* § 2607(c)(1).

**D.    The Sixth Circuit's Prohibition Against Freestanding Inquiries Into The Bona Fides Of An Affiliated Business Arrangement.**

The CFPB's position that the Title LLCs were not *bona fide* providers of settlement services, as well as its position that distributions from the Title LLCs were not *bona fide* distributions, stems from the *bona fide* inquiries set forth under HUD Policy Statement 1996-2 and 12 C.F.R. § 1024.15.  The Policy Statement promulgated ten factors that HUD (and then the CFPB) used to determine whether an entity "is a *bona fide* provider of settlement services or is merely a sham arrangement used as a conduit for referral fee payments."  61 Fed. Reg. 29,258 (1996).  Similarly, the CFPB maintains that the regulation requires a detailed inquiry into whether distributions with respect to ownership interests in affiliated business arrangements are *bona fide* pursuant to 24 C.F.R. § 3500.15(b)(3).

Recently, however, in *Carter*, the Sixth Circuit expressly rejected the use of freestanding inquiries into the *bona fides* of an affiliated business arrangement.  In 2010, the United States District Court for the Northern District of Ohio ruled the Policy Statement unconstitutional because of the inherent vagueness of the ten-factor test.  *Carter v. Welles-Bowen Realty Inc.*, 719 F. Supp. 2d 846 (N.D. Ohio 2010 ), *aff'd*, 736 F.3d 722 (6th Cir. 2013).  There, a purported plaintiff class of consumers alleged that Chicago Title Insurance Company partnered with two real estate firms, Welles-Bowen Realty and Danberry Co., to create two sham title companies in violation of § 2607(a).  *Id.* at 848-49.  In its motion for summary judgment, Welles-Bowen argued that it was entitled to summary judgment because its conduct was covered by the exception for affiliated business arrangements in 12 U.S.C. § 2607(c)(4).  *Id.* at 850.  The plaintiffs argued that for Welles-Bowen "to take advantage of the Section 2607(c)(4) exception . . . an [affiliated business arrangement must first be a '*bona fide* provider of settlement services.'"

*Id.* (emphasis added).  They asserted that this "determination is made . . . by applying the ten-factor test" of the Policy Statement.

In holding that the ten-factor test was unconstitutionally vague, the court observed that "half of the factors use vague terms."  *Id.* at 853.  To illustrate its point, the court specifically referenced the first, fifth, sixth, seventh, and ninth factors, which it opined "invite[d] a highly subjective evaluation."  *Id.*  And "[t]he Policy Statement gives no guidance as to what level of capital would be deemed 'sufficient,' how many services must be performed to be deemed 'substantial,' what 'reasonable' rates are, or what an entity must do to 'actively compete.'"  *Id.*

The district court's decision was appealed to the Sixth Circuit, which affirmed.  In its opinion, the court explained that there were two ways to view the claim before it – an "easy way" and a "more complicated way."  *Carter*, 736 F.3d at 725.  "The easy way turns on the safe harbor provisions set out in § 2607(c)(4)."  *Id.*  Under this approach, the court concluded that Welles-Bowen's relationship with WB "satisfied the three safe-harbor conditions."  *Id.* at 726.  Welles-Bowen had "disclosed the arrangement to the buyers," "allowed them to reject the referrals, and neither Welles-Bowen nor its owners received anything of value from the arrangement apart from a return on their ownership interests."  *Id.*  Accordingly, Welles-Bowen qualified for safe harbor protection.  *Id.*

According to the Sixth Circuit, the more complicated analysis takes into account the Policy Statement.  *Id.*  The court explained that the Policy Statement added a fourth, '*bona fide*,' requirement to the three safeguards "already contained in § 2607(c)(4)."  *Id.*  Reflecting on this added requirement, the court noted that "a safe harbor is not very safe if a federal agency may add a new requirement to it through a policy statement."  *Id.*

Resolved to follow the simple approach to addressing whether Welles-Bowen's affiliated business arrangement was exempt from the referral fees ban, the court dispensed with the notion that the framers of RESPA intended "provider of settlement services" to mean "*bona fide* provider of settlement services" such that an agency could then administer a complicated test to determine the provider's bona fides apart from what the statute requires. *Id.* at 728 (emphasis added). The court opined that the "most natural interpretation of 'provider of settlement services' is . . . one who provides settlement services." *Id.* Period.

The Sixth Circuit further supported its conclusion by bringing attention to the fact that § 2607(c)(2) of RESPA protects "'the payment to any person of a *bona fide* salary or compensation or other payment for goods or facilities actually furnished or for services actually performed.'" *Id.* (quoting § 2607(c)(2)). The court observed that the term *bona fide* is used in this exception, but is omitted from the "affiliated business arrangement exception." *Id.* According to the court, "[t]his disparity confirms that the [affiliated-business-arrangement exception] *does not call upon the courts to conduct a free standing inquiry into a provider's bona fides unconnected to the safe-harbor test already baked into the statute.*" *Id.* (emphasis added). To further underscore the importance of limiting the § 2607 safe harbor analysis to the four corners of the statute, the court noted that incorporating an additional multi-factor inquiry into the analysis "would reintroduce much of the uncertainty the safe harbor meant to eliminate." *Id.* at 729. Based on these reasons, the court affirmed the district court's ruling. *Id.*

*Carter* thus prohibits a freestanding inquiry into the *bona fides* of an affiliated business arrangement. Nonetheless, the CFPB's complaint and its discovery requests demonstrate a blatant disregard for *Carter's* import. In fact, the CFPB has stated that the *Carter* decision is not "dispositive here because the decision addressed the narrow issue of the applicability of an

-8-

agency statement of policy upon which the [plaintiff] does not intend to rely." (DE 7, at 1.) Despite this statement in the record that it does not intend to rely on the policy statement, the CFPB has served extensive discovery requests upon the Defendants and third parties that demand enormous detail on the very factors contained in the discredited policy statement.[2]

For example, Interrogatory No. 2 served upon Borders & Borders and each Borders defendant, calls for extraordinary and irrelevant detail concerning "any Title LLC that actually existed or was considered or proposed," including the identities of anyone "considered, proposed, or discussed becoming a co-owner of the Title LLC" regardless of whether any such persons actually became an owner. The interrogatory further seeks the date and method of every communication with any such person.

The requests for admission, specifically Request No.'s 1-11, call for incredibly minute detail concerning the operation of the Title LLC's. For example, Request No. 4 asks that the Borders "[a]dmit that there was no substantive difference in the work performed by Danetta Mattingly for each of the nine Title LLCs and [the Borders]." (Ex. B, at 7 ¶ 4.) Request No. 17 asks that the Borders "[a]dmit that the Title LLCs did not perform any title services that [the Borders] could not perform [themselves]." (Ex. B, at 9 ¶ 8.) Factor (2) of the ten-factor test asks whether "the new entity [is] staffed with its own employees to perform the services it provides? Or does the new entity have 'loaned' employees of one of the parent providers?" *Carter*, 719 F. Supp. at 851.Factor (6) inquires as to whether "the new entity perform[s] all of the substantial services itself? Or does it contract out part of the work? If so, how much of the work is contracted out." *Id.* The CFPB's requests are an obvious attempt to obtain this information.

---

[2]A copy of the CFPB's discovery requests to Borders & Borders is attached as <u>Exhibit A</u>. The CFPB has served identical sets of discovery upon the three individual Borders defendants. Similar subpoenas have been served on the JVPs.

Finally, the CFPB's requests for production of documents, specifically Request No.'s 3, 4, 7, 8, 9, and 10 would require the production of literally every document or communication related to the Title LLCs in any manner whatsoever.  For instance, Requests 8 and 9 ask for documents "sufficient to show all actual expenses of each Title LLC" and "sufficient to show how [Ms. Mattingly's] income for the Title LLC work was determined."  (Ex. B, at 19, ¶ 8, 9.) This clearly amounts to just the sort of "freestanding inquiry into a provider's bona fides unconnected to the safe-harbor test already baked into the statute," which the Sixth Circuit has instructed is not permissible.  *Carter*, 736 F.3d at 728-729.

Accordingly, defendants seek an order limiting discovery to information relevant to the three safe-harbor criteria set forth in 12 U.S.C. § 2607(c)(4).

## STANDARD

When a "party or any person from whom discovery is sought" moves for a protective order, district courts have broad discretion pursuant to Fed. R. Civ. P. 26(c) to limit discovery. *Century Prod., Inc. v. Sutter*, 837 F.2d 247, 250 (6th Cir. 1988).  They "may, for good cause, issue an order to protect a party from annoyance, embarrassment, oppression, or undue burden or expense".  FRCP  26(c)(1).  When good cause is shown, courts may "forbid[] inquiry into certain matters, or limit[] the scope of disclosure or discovery to certain matters."  FRCP 26(c)(1)(D). When filing the motion, the movant must include certification indicating that the movant "has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action."  FRCP 26(c)(1).   Counsel for Borders has attempted to resolve this discovery dispute extrajudicially with the CFPB, to no avail. A certification to this effect is tendered with this motion.

**ARGUMENT**

A.   **The Court Should Limit Discovery To Whether Defendants Qualify For The Affiliated Business Arrangement Safe Harbor Under § 2607(c)(4).**

   1.   *Carter v. Welles-Bowen* Establishes That Initial Discovery In This Case Should Be Limited To Facts Relevant To Whether Defendants Satisfied The Conditions For Safe Harbor.

   In *Carter*, the Sixth Circuit made clear that affiliated business arrangements are entitled to the statutory safe harbor when the three criteria in § 2607(c)(4) are met.  *Carter*, 736 F.3d at 728.  This Court is bound to follow the precedent established in *Carter*.  *See Timmreck v. United States,* 577 F.2d 372, 374 n.6 (6th Cir. 1978) ("The district courts in this circuit are, of course, bound by pertinent decisions of this Court even if they find what they consider more persuasive authority in other circuits.") *rev'd on other grounds*, 441 U.S. 780, 60 L. Ed. 2d 634, 99 S. Ct. 2085 (1979).  Therefore, this Court must embrace the "easy way" to analyze whether the affiliated business arrangement exception applies.  This analysis does not permit a "freestanding inquiry" into the arrangement's *bona fides*.  *Carter*, 736 F.3d at 725.  The CFPB's interrogatories, documents requests, and requests for admissions seeking information beyond that necessary to determine qualification for safe harbor are inappropriate under *Carter*, and Defendants should not be required to answer them.

   The only relevant questions to determine qualification for the safe harbor are (a) whether disclosures of the arrangements and estimates of costs were made to the consumers; (b) whether consumers were allowed to select an alternative provider; and (c) whether anything of value was distributed beyond a return on ownership interest.  Voluminous information on these points has already been provided to the CFPB in the course of its investigation, and it will be confirmed in responding to its discovery.

    **2.**      **A Protective Order Is Necessary To Limit The Scope Of Plaintiff's Discovery Requests.**

As explained above, a protective order is necessary here because the CFPB has indicated in its complaint, its statements to the Court, and in its discovery requests that it wishes to conduct a "freestanding inquiry" into the bona fides of the Title LLC's, despite the admonition in *Carter* that this is neither permitted nor appropriate.  In its complaint, the CFPB argues that Defendants are not eligible for safe harbor protection "because the Title LLCs did not constitute *bona fide* 'providers of settlement services' within the meaning of RESPA."  (R. 1, at 6 (emphasis added).)  The CFPB further states that Defendants are not entitled to safe harbor protection because of its position that the distributions made from the Title LLCs allegedly "did not constitute *bona fide* returns on ownership interest."  (*Id.* (emphasis added).)

It is evident from the CFPB's allegations, statements, and discovery requests referenced above that it seeks to circumvent the *Carter* decision.  The CFPB even admits as much, maintaining in the Agreed Litigation Plan and Discovery Schedule Plan that *Carter* is not dispositive of the issues here.  (R. 7, at 1.)  CFPB refuses to recognize that *Carter* expressly rejects any freestanding inquiry into the bona fides of the Title LLCs.  As emphasized by the Sixth Circuit, "a statutory safe harbor is not very safe if a federal agency may add a new requirement to it through a policy statement."  *Carter*, 736 F.3d at 726.  The same is true if an agency can purport to add additional requirements by regulation or by its own enforcement agenda.  If CFPB believes RESPA is too lenient and its exceptions and safe harbors should be eliminated, then it should request Congress to amend the statute rather than singling out the Borders firm for punishment for designing its operations to comply with the statutory safe harbor.

With its policy statement discredited, the CFPB will likely rely on its regulation, but it injects just as much arbitrariness and uncertainty into what affiliated business arrangements qualify for the safe harbor as the policy statement.  It provides that "whether a thing of value is a return on ownership interest will be determined by analyzing the facts and circumstances on a *case by case* basis."  12 C.F.R. § 1024.15(b)(3)(iii) (emphasis added).  This is precisely the type of subjective analysis reflected in the policy statement and rejected by the Sixth Circuit.  If the CFPB is allowed to make such a determination on a "case by case basis," settlement service providers that choose to operate affiliated business arrangements in accordance with § 2607(c)(4) can no longer rely on the four corners of § 2607 for protection.  This ignores the intent of Congress in creating § 2607(c)(4), and is impermissible under *Carter*.  *Carter* explicitly rejects this form of inquiry because it breeds uncertainty, extends the inquiry beyond the four corners of § 2607, and, quite simply, makes the 'safe harbor' treacherous again.  The CFPB must be prohibited from seeking discovery beyond that which is necessary to determine whether Defendants qualify for the statutory safe harbor.

**B.**    **Discovery Should Be Limited In Accordance With The Applicable Statute Of Limitations And The Tolling Agreement.**

Pursuant to 12 U.S.C. § 2614, the statute of limitations for an alleged violation of § 2607(a) is three years.  The tolling agreement executed by the CFPB and Borders & Borders on October 24, 2012 tolled the statute of limitations for one year from that date.  Accordingly, all claims related to the alleged RESPA violations by the Borders firm prior to October 24, 2009 are time-barred, and all claims against the individual Borders defendants prior to October 24, 2010 are time-barred.  Thus, the CFPB is not entitled to any documents, answers to interrogatories, or answers to admissions regarding any alleged violations that occurred prior to October 24, 2009 with regard to the Borders firm, or October 24, 2010 with regard to the individual Borders

-13-

defendants.  Accordingly, the Court should limit any inquiries, document requests, or requests for admissions that seek information concerning any alleged violations prior to these dates.

## CONCLUSION

*Carter* explicitly prohibits a freestanding inquiry into the so-called *bona fides* of affiliated business arrangements, yet that is exactly what the CFPB seeks in this action.  Accordingly, this Court should reject the CFPB's attempt to bludgeon the Defendants with expensive, burdensome, and ultimately unnecessary discovery.  Instead, the Court should limit the scope of discovery to documents, interrogatories, and requests for admission germane to whether Defendants satisfied the three conditions for the statutory safe harbor for affiliated business arrangements, accorded by Congress pursuant to 12 U.S.C. § 2607(c)(4).  Further, the Court should limit the scope of discovery to matters within the applicable three-year statute of limitations.

Respectfully submitted,


*/s/ T. Morgan Ward, Jr.*
T. Morgan Ward, Jr. (mward@stites.com)
Richard A. Vance (rvance@stites.com)
Michael Denbow (mdenbow@stites.com)
Daniel J. Cameron (dcameron@stites.com)
STITES & HARBISON, PLLC
400 West Market Street, Suite 1800
Louisville, KY  40202-3352
Telephone:  (502) 587-3400
COUNSEL FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on April 8,  2014, I electronically filed the foregoing memorandum with the clerk of the court by using the CM/ECF system and served electronically upon the parties accepting electronic service. Parties may access this filing through the court's ECF system.

*/s/ T. Morgan Ward, Jr.*
T. Morgan Ward, Jr.

970581:LOUISVILLE