UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:13-CV-1047-JGH

CONSUMER FINANCIAL PROTECTION BUREAU                    PLAINTIFF

v.

BORDERS & BORDERS, PLC, *et al.*                         DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

Buying real estate can be complicated and costly. There are titles to check, conditions to inspect, and lawyers to hire. In the not-too-distant past, it was even more costly—unscrupulous real estate professionals and lawyers would give and take kickbacks during settlement services and improperly drive up the cost of real estate transactions. Since the 1970s, Congress has entrusted regulatory watchdogs with halting these illegal kickbacks. Today, the Consumer Financial Protection Bureau pursues civil enforcement actions against supposed violators of anti-kickback laws.

The CFPB now believes that a Louisville, Kentucky, law firm, Borders & Borders, PLC, as well as individual members of that firm (collectively, "the Borders"), have violated the relevant laws. The Borders, though, believe that their actions are legal under statutory safe harbor provisions. They have asked this Court to grant judgment on the pleadings, effectively a dismissal of the CFPB's case with prejudice. The Court believes, however, that the CFPB has pled facts sufficient to both give the Borders fair notice and allow this Court to conclude that the CFPB's claims are legally plausible. Thus, for the following reasons, the Court will not grant judgment on the pleadings.

I.

In 1974 Congress created the Real Estate Settlement Procedures Act (RESPA) to curb abuses in the real estate settlement process. Kickbacks and unearned fees were driving up the costs of real estate settlements, resulting in unnecessarily high settlement charges. Thus, RESPA and its enabling regulations prohibited the giving and receiving "of any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). Originally, the Secretary of the Department of Housing and Urban Development enforced RESPA and took action against violators. Upon its relatively recent creation, though, the Consumer Financial Protection Bureau was charged with enforcing violations of "Federal consumer financial law," 12 U.S.C. §§ 551(c)(4), 5512(a), and 5564(a), including RESPA violations. 12 U.S.C. § 5481(12)(M), (14). The CFPB's sights are now set on the Borders.

Borders & Borders, PLC is a small, family-owned law firm focusing on residential real estate closings in Louisville, Kentucky. J. David Borders established the firm in 1971, and his two sons, John, Jr. and Harry Borders, now manage the business. Lenders hire the Borders to prepare real estate conveyance and mortgage documents and conduct closings. The Borders do not represent borrowers. Over the years, the Borders have developed strong relationships with local real estate brokers and agents, mortgage brokers, lenders, and other real estate professionals. Some years ago, the Borders entered into nine joint ventures with some of these real estate professionals ("the Joint Venture Partners"). These joint ventures ("the Title LLCs") were Kentucky limited liability companies that served as title insurance agents for two title insurance companies. The individual Borders defendants owned 50 percent of each Title LLC

and the Joint Venture Partners owned the remainders. From 2006 to 2011,[1] the Borders referred borrowers to these Title LLCs in connection with real estate closings. When the borrowers purchased title insurance from the Title LLCs, the Title LLCs received 80 percent commission on the insurance premium, and the remaining 20 percent went to the title insurance companies. Then, the Borders and the Joint Venture Partners received profit distributions as returns on ownership interests in the Title LLCs. Aye, there's the rub.

The CFPB believes that this process is illegal. Specifically, the CFPB alleges that these "profit distributions" were really just kickbacks paid for referrals. Its concerns spring in part from the nature of the Title LLCs—the Borders provided the initial capitalizations for most Title LLCs, and the funding only covered the Title LLCs' Errors and Omissions insurance. Allegedly, the Joint Venture Partners often did not contribute any initial capitalization funds. Each Title LLC had but one staffer, an independent contractor whom was simultaneously shared by all the Title LLCs and concurrently employed by Borders & Borders. The Borders—or their agents or employees—managed the Title LLCs, and the nine Title LLCs did not have office spaces, email addresses, phone numbers, nor could they function without the Borders. The Title LLCs did not advertise to the public, and all of their business came from the Borders' referrals. The CFPB doubts that these Title LLCs did any substantive work: It alleges that the Borders, not the Title LLCs, (1) researched and reported the condition of the title; (2) reviewed title reports and decided what conditions and exceptions should be included in a title commitment to issue title insurance; (3) resolved the conditions on the title commitment in order to issue the title insurance; (4) prepared insurance closing letters; (5) prepared title insurance commitments; and (6) conducted closings.

---

[1] In 2011 HUD informed the Borders that they were being investigated for possible RESPA violations. Apparently, the start of the investigation persuaded the Borders to wind down some or all of the Title LLCs.

To effectuate this arrangement, whenever a Joint Venture Partner made an initial referral of closing or settlement services to the Borders involving a federally related mortgage loan, the Borders would arrange for the title insurance on the underlying transaction to be processed by the particular Title LLC co-owned by the Joint Venture Partner who referred the business to the Borders. The profits that the Title LLC supposedly generated were then split amongst the Borders and the Joint Venture Partners. According to the CFPB, this system assured that the referring Joint Venture Partner was compensated for the initial referral. The Borders received substantial payments from the Title LLCs, purportedly from ownership interests, on top of significant fees for closing services.

Meanwhile, the Borders—without necessarily disputing these factual assertions—say that their conduct falls within a statutory safe harbor. RESPA does in fact contain a statutory safe harbor that protects "affiliated business arrangements," or "ABAs." 12 U.S.C. § 2607(c)(4). The safe harbor authorizes certain referrals to providers of settlement services, so long as the referral is made to an ABA which comports with three statutory elements. Those three elements are: (1) a disclosure of the nature of the ABA at the time of the referral, which conforms to certain procedural requirements; (2) the referred customer may not be required to accept the referral to proceed; and (3) the only thing of value received from the ABA must be a return on ownership interest or franchise relationship. *See id.* The Borders believe their enterprise falls within this safe harbor. And so, they argue that the pleadings require judgment in their favor.

The CFPB disagrees. Indeed, it disputes—explicitly and implicitly—each of the statutory requirements. First, it doubts that ABA disclosures were consistently made. Even when there were disclosures, the CFPB is convinced that the disclosures did not substantially comply with regulatory requirements. Second, the CFPB frets that the disclosures were not

4

timely—that they were made at closing and not at the time of referral. This is problematic: Not only does the statute dictate disclosures at the time of referral, making the disclosures at closing could also negate the second factor. After all, if disclosures are made only at closing, customers might practically be required to accept the referral. Most importantly, though, the CFPB disputes the safe harbor was met because of alleged sham returns on ownership interest. While the Borders maintain that any money derived from the Title LLCs is a return on ownership, the CFPB argues that the system is nothing more than an elaborate gimmick to provide cover for illegal kickbacks exchanged for referrals. In sum, the CFPB maintains that judgment is inappropriate at this time and that discovery should proceed.

II.

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings is weighed under the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Wee Care Child Ctr., Inc. v. Lumpkin*, 680 F.3d 841, 846 (6th Cir. 2012). Thus, courts faced with a Rule 12(c) motion must accept the plaintiff's well-pled allegations as true, "and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 582 (6th Cir. 2007) (citation omitted). To avoid judgment on the pleadings, "a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007). The complaint "must contain sufficient factual matter to 'state a claim that is plausible on its face.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). And facial plausibility exists "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556)). That is, the plaintiff "must plead 'sufficient factual matter' to render the legal claim . . . more than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (internal citation omitted). Courts will review the facts in the light most favorable to the non-moving party. *See Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995) (citation omitted). And, finally, courts may consider the complaint, the answer, and any written instrument attached as exhibits when deciding motions for judgment on the pleadings. Fed. Rs. Civ. P. 12(c), 7(a).

A.

The parties vigorously dispute the effect of a recent Sixth Circuit case, *Carter v. Welles-Bowles Realty, Inc.*, 736 F.3d 722 (6th Cir. 2013). In that case, home buyers sued Welles-Bowen, a real estate agency, and two title service companies, WB Title and Chicago Title. *Id*. at 724. Welles-Bowles and Chicago Title co-owned WB Title. Referrals were made and profits were distributed according to supposed ownership interests. Like this case, the home buyers believed that the Welles-Bowles scheme was impermissible under RESPA. *Id.* Unlike this case, all parties in *Carter* agreed that the statutory safe harbor elements had been met. *Id*. The sticking point was whether a HUD policy statement, which essentially added a fourth element regarding the bona fides of an ABA, was valid. *Id*. The district court sided with the companies, holding that any safe harbor requirement added on top of the three expressly enumerated statutory elements was invalid. *Id*. at 725. On appeal, the United States intervened to salvage the policy statement. *Id*. The United States was unsuccessful; the Sixth Circuit upheld the district court. *Id*. at 724.

6

The Borders contend that, despite the Sixth Circuit's decision, the CFPB still clings to the bona fides theory of liability. They say the complaint closely tracks the ten-factor bona fides test laid out in HUD's Policy Statement 1996-2, 61 Fed. Reg. 29258. These ten-factors inquire about whether the ABA entity was undercapitalized, managed its own affairs, did any substantive work, and the like. In briefing, the Borders persuasively followed the CFPB's complaint and showed overlaps with Policy Statement 1996-2. When *Carter* was published—after this case began—the Borders even asked the CFPB to voluntarily relinquish this case based on the death of the bona fides inquiry in this Circuit. It refrained. Instead, the Borders now ask this Court for a judgment on the pleadings. They say that without the bona fides inquiry, there is no longer a plausible legal theory for the CFPB to pursue.

The Court disagrees. The obvious difference between *Carter* and this case is that, here, the parties do not agree that the safe harbor's three statutory elements have been met. *See Carter*, 736 F.3d at 724. Despite the Borders' assertion that the CFPB's complaint alleges enough to conclude that the safe harbor has been met, the Court's reading of the relevant documents is that the CFPB disputes each factor. If the Borders ABAs do not comport with the safe harbor elements, the Borders are liable under RESPA. And since the CFPB alleges that the Borders do not comport with the safe harbor, the CFPB is pursuing a valid legal theory.

As well, the complaint is plausible on its face since there is enough factual detail for this Court to draw the reasonable conclusion that the Borders committed the alleged misconduct. *See Iqbal*, 556 U.S. at 663. RESPA requires that ABAs be disclosed. 12 U.S.C. § 2607(c)(4)(A). The Borders argue that the complaint admits the disclosures were given. But this is not the whole truth—the complaint says only that the disclosures were *sometimes* given. DN 42, Page ID # 211 (citing Complaint, ¶ 25). The CFPB believes that there were instances when

7

disclosures were not given, and it wishes to conduct discovery on this issue. Moreover, the CFPB argues that the disclosures were deficient for other reasons. Admittedly, some of these issues—relating to font, signature lines, and the like—may seem like hyper-technicalities. As a sister court has held, though, deviations from disclosure requirements will deny defendants' entry into the safe harbor where the deviations "represent a threat to the basic purpose" of ABA disclosure requirements. *Toldy v. Fifth Third Mortg., Co.*, 721 F.Supp. 2d 696, 711 (N.D. Ohio 2010). More than threadbare assertions, the CFPB has made enough factual allegations—that there was *not* an acknowledgement section required on each disclosure, that the disclosures were not made timely—for the Court to draw the reasonable conclusion that the first safe harbor element was not met.

RESPA also requires that the only value received from the ABA be a return on ownership interest. 12 U.S.C. § 2607(c)(4)(C). The CFPB dedicated much of the complaint and briefing to describing a scheme to camouflage impermissible kickbacks as returns on ownership interest. To be fair to the Borders, the *Carter* decision is intellectually related to this issue. In striking the bona fides test, the Sixth Circuit addressed the use of the phrase "provider of settlement services" in RESPA's safe harbor. *Carter*, 736 F.3d at 728. Whereas Policy Statement 1996-2 essentially transformed the inquiry into whether the ABA was a "bona fide provider of settlement services," the Sixth Circuit held that the "most natural interpretation of 'provider of settlement services' is . . . one who provides settlement services. And the buyers concede that [the ABA at issue in *Carter*] provides settlement services." *Id*. Unlike the buyers in *Carter*, the CFPB alleges that the Title LLCs did *not* provide settlement services. Rather, the CFPB views the value the Borders and the Joint Venture Partners received from the Title LLCs as an impermissible kickback paid out as a referral fee. At this stage—when an inference can be drawn either of two

8

ways: that the scheme is a permissible payment of ownership interest or that the payments are merely kickbacks dressed up as returns on interest—this Court must draw its inference in favor of the CFPB, the non-moving party. *Columbia Natural Res., Inc.*, 58 F.3d at 1109. Drawing its inference accordingly, the Court is convinced that the CFPB has pled enough factually to make this impermissible scheme "more than merely possible." *Fritz*, 592 F.3d at 722.

B.

The Borders also fear they were not given fair notice, that the CFPB has overreached in asking for injunctive relief, and that the statute of limitations has run on at least some of the alleged impermissible conduct. The notice in this case has been more than sufficient. The complaint provides a timeline and sufficient detail concerning the alleged violations. Put simply, there is enough written in the complaint for the Borders to know what they must defend themselves against. The CFPB has provided both a short and plain statement showing entitlement to relief and given the Borders "fair notice of what the claim is and the grounds upon which it rests." Fed. R. Civ. P. 8; *Twombly*, 550 U.S. at 555. As for the concerns about injunctive relief and the statute of limitations, those issues are not yet ripe. The question here is whether the Borders are "clearly entitled to judgment." *Winget*, 510 F.3d at 582. The injunction issue is really a question of remedy—it does not address whether the Borders are entitled to judgment. As well, even if the statute of limitations bars liability on some of the conduct at issue, it seemingly would not bar all of it. And so, the statute of limitations issue also offers no guidance on whether the Borders are clearly entitled to judgment.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motion for judgment on the pleadings is DENIED.

cc: Counsel of Record