UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CONSUMER FINANCIAL PROTECTION BUREAU,

PLAINTIFF,

v.

BORDERS & BORDERS, PLC, et al.

DEFENDANTS.

CIVIL ACTION NO. 3:13-CV-1047-CRS-DW

***Electronically Filed***

---

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO BIND THE CFPB TO ITS RULE 30(b)(6) TESTIMONY**

---

T. Morgan Ward, Jr.
Richard A. Vance
David B. Owsley II
Michael Denbow
STITES & HARBISON PLLC
400 West Market Street
Suite 1800
Louisville, KY 40202-3352
*Counsel for Defendants*

# TABLE OF CONTENTS


Page

I. INTRODUCTION ... 1

II. BACKGROUND ... 1

A. The CFPB's theory of RESPA violation evolved after Carter. ... 1

B. The CFPB evaded discovery about the basis for its claims. ... 3

C. The Court ordered the CFPB to appear for a Rule 30(b)(6) deposition... 4

D. The CFPB failed to prepare testimony on the majority of topics and instructed its representative not to answer approximately 200 times. ... 5

III. ARGUMENT ... 6

A. Legal Standard ... 6

B. The CFPB must be bound to its testimony and precluded from offering evidence on topics for which it either failed or refused to answer ... 10

1. The CFPB's contentions of alleged RESPA violations (Topics 1-2) ... 10

2. Contentions regarding the safe harbor for affiliated businesses and the Borders' disclosure practices (Topics 3-7, 10) ... 16

a. The CFPB could not contest the Borders' disclosure practices ... 17

b. The CFPB refused to explain how the content of the Borders' form was "a threat to the basic purpose" of the disclosure. ... 18

c. The CFPB refused to disclose its timing contention... 20

3. Contentions regarding the services provided by the Borders and Title LLCs and "substantive title work" (Topics 11-13) ... 21

4. The undefined phrases in the CFPB's allegations (Topic 16-25) ... 24

5. Contentions about the policy invalidated in Carter (Topics 26-30)... 29

6. The substantial delay in the CFPB's investigation (Topic 31) ... 31

7. The CFPB's purported witnesses and evidence (Topics 32-34) ... 32

8. The CFPB's claims for monetary and injunctive relief (Topics 37-38) ... 35

C. The CFPB must be bound by its lack of evidence of consumer harm. ... 37

IV. CONCLUSION ... 39

# TABLE OF AUTHORITIES

**Page**

**Cases**


*A.R. v. Dudek*, 2015 U.S. Dist. LEXIS 6426 (S.D. Fla. Jan. 15, 2015) .......... 9

*Blackhorse Lane Ass'n, L.P. v. Dow Chem. Corp.*, 228 F.3d 275 (3rd Cir. 2000) .......... 9

*Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722 (6th Cir. Ohio 2013) .......... *passim*

*Chevron Corp. v. Stratus Consulting, Inc.*, 2010 U.S. Dist. LEXIS 110023 (D. Colo. Oct. 1, 2010). .......... 37

*EEOC v. LifeCare Mgmt. Servs., LLC,* 2009 U.S. Dist. LEXIS 21224 (W.D. Pa. Mar. 17, 2009) 8

*FDIC v. Butcher*, 116 F.R.D. 196, 200 (E.D. Tenn. 1986) .......... 8

*Ford v. New Century Mortg. Corp.*, 797 F. Supp. 2d 862 (N.D. Ohio 2011) .......... 11

*Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695 (10th Cir. 1998) .......... 8

*Ierardi v. Lorillard,* 1991 U.S. Dist. LEXIS 11320 (E.D. Pa. 1991) .......... 10

*In re Classicstar Mare Lease Litig.*, 2012 U.S. Dist. LEXIS 50982(E.D. Ky. 2012) .......... 6

*In RE PHH Corp., et al*, 2014-CFPB-002 (June 4, 2015) .......... 10

*In re Vitamins Antitrust Litigation*, 216 F.R.D. 168 (D.D.C. 2003) .......... 9

*Janko Enters. v. Long John Silver's, Inc.*, 2014 U.S. Dist. LEXIS 185334 (W.D. Ky. Apr. 3, 2014) .......... 6

*Kovad Communications Co. v. Revonet, Inc.*, 267 F.R.D. 14 (D.D.C. 2010) .......... 9

*Lane v. Vitek Real Estate Indus. Group*, 713 F. Supp. 2d 1092 (E.D. Cal. 2010) .......... 11

*PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d 1 (D.C. Cir. 2016) .......... *passim*

*QBE Ins. Corp. v. Jorda Enters.*, 277 F.R.D. 676 (S.D. Fla. 2012) .......... 6

*Resolution Trust Corp. v. So. Union Co., Inc.*, 985 F.2d 196 (5th Cir. 1993) .......... 8

*SEC v. Collins & Aikman Corp.*, 256 F.R.D. 403 (S.D.N.Y. 2009) .......... 7

*SEC v. Kramer*, 778 F. Supp. 2d 1320 (M.D. Fla. 2011) .......... 8

*SEC v. Merkin*, 283 F.R.D. 689 (S.D. Fla. 2012) .......... 7

## TABLE OF AUTHORITIES

**Page**

*Starlight Int'l, Inc. v. Agrlihy*, 186 F.R.D. 626 (D.Kan. 1999) .......... 9

*United States ex rel. Fry v. Health Alliance of Greater Cincinnati*, 2009 U.S. Dist. LEXIS 122533 (S.D. Ohio Nov. 20, 2009) .......... 7

*United States v. Educ. Mgmt. LLC*, 2014 U.S. Dist. LEXIS 48841 (W.D. Pa. Apr. 9, 2014) .......... 7

*United States v. Taylor*, 166 F.R.D. 356 (M.D.N.C. 1996) .......... 9

*Whitman v. United States*, 135 S. Ct. 352 (U.S. 2014) .......... 25

*Wilkinson v. Greater Dayton Reg'l Transit Auth.*, 2014 U.S. Dist. LEXIS 64522 (S.D. Ohio May 9, 2014) .......... 8

**Statutes**

12 U.S.C. § 2607(c)(1), (c)(2) .......... 21

12 U.S.C. § 2607(c)(4) .......... 2

**Rules**

Rule 37(c)(1) .......... 37

Rule 26(a)(1)(A)(iii) .......... 35

Rule 30(b)(6) .......... *passim*

Rule 37(b)(2)(A) .......... 9

Rule 37(d) .......... 9

**Regulations**

12 C.F.R. § 1024.14(g) .......... 39

## EXHIBITS

Exhibit 1 – Rule 30(b)(6) Deposition Notice to CFPB

Exhibit 2 – Deposition Transcript of CFPB Rule 30(b)(6) Representative Glenn Melcher

Exhibit 3 – CFPB Rule 30(b)(6) Deposition "Script"

Exhibit 4 – Spreadsheet Excerpt of Closing Transactions from CFPB's Rule 30(b)(6) Deposition

# I. INTRODUCTION

The Borders defendants (collectively, the "Borders") move to bind the CFPB to the September 15, 2016 testimony of its Rule 30(b)(6) representative, and to preclude the CFPB from offering evidence or argument during dispositive motions or trial on topics for which the CFPB either failed to prepare testimony or instructed its representative not to answer questions.

The Court ordered the CFPB to appear for the Rule 30(b)(6) deposition on 34 topics, and issued a detailed opinion addressing the relevance of the topics . (DN119). Despite the Court's order, in response to questions on nearly all the topics, the CFPB either prepared no testimony, or asserted blanket objections and refused to answer. CFPB counsel instructed the agency's representative not to answer questions approximately 200 times. As a result, the Borders were substantially limited in obtaining binding testimony on issues that the Court determined were relevant to the Borders' defenses and the CFPB's contentions of alleged RESPA violations. The blanket privilege objections should preclude the CFPB from later strategically lifting that privilege shield on questions that the CFPB refused to answer in discovery.

Pursuant to Rules 30(b)(6), 37(d), and 37(b)(2), the Borders seek to bind the CFPB to its testimony, or lack thereof. This has been a six-year investigation in which the CFPB's theories have been a moving target. The requested order is necessary and appropriate to lock down the CFPB's positions and posture this case for dispositive motion and, if necessary, trial.

# II. BACKGROUND

## A. The CFPB's theory of RESPA violation evolved after *Carter.*

The CFPB filed this lawsuit in October 2013 following a HUD investigation that began sometime in 2010. The HUD investigation centered on title insurance agencies that the Borders established as joint ventures with real estate brokers in the Louisville area. At all times, these title agencies (the "Title LLCs") satisfied the elements for "affiliated business arrangements,"

which are expressly permitted in Section 8(c)(4) of the Real Estate Settlement Practices Act, 12 U.S.C. § 2607(c)(4). In compliance with RESPA, the Borders gave written disclosures to consumers about the affiliation when referring title insurance underwriting to the joint venture Title LLCs. The profit distributions from the Title LLCs were made in accordance with the ownership percentages of the members, all of which is reflected in federal tax returns prepared by an outside CPA. The Title LLCs issued valid insurance policies, and there has never been any allegation that any consumer was harmed or overcharged for the Borders' closing services or the Title LLCs. The Borders believed their accounting and disclosure records showed that the transparent operation of these joint ventures was in full compliance with RESPA.

The Borders provided documents showing its RESPA compliance to HUD in early 2011 and then heard nothing further from that agency. Following the HUD investigation, the CFPB took power and informed the Borders that, notwithstanding the statutory allowance for affiliated businesses, the profit distributions of the Title LLCs constituted impermissible "kickbacks" because the CFPB concluded that the entities did not satisfy an agency-created ten-factor test and were thus "shams." This ten-factor test was set forth in an informal policy statement (HUD Policy Statement 1996-2) and was never promulgated as a federal regulation. Pursuant to the CFPB's subjective assessment of this ten-factor test, the CFPB concluded that the Title LLCs were not "bona fide providers of real estate services" and thus the profit distributions "did not constitute bona fide returns on ownership interest." (DN1 ¶30). The CFPB's complaint recited the ten factors as allegations supporting the RESPA violation. (DN20-1 at p. 6-9).

In November 2013, one month after the CFPB complaint, the Sixth Circuit ruled that the ten factor test was invalid. *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 724 (6th Cir. 2013). The Sixth Circuit held that the agency's "bona fides" factors were ambiguous, subjective,

and exceeded the elements of the three-part statutory safe harbor in RESPA Section 8(c)(4). *Id.* at 725-29. The Court noted "a statutory safe harbor is not very safe if a federal agency may add a new requirement to it through a policy statement." *Id.* at 726. The Sixth Circuit held that this is an issue of fair notice to the regulated industry because a violation of RESPA carries both civil and criminal penalties. *Id.* Notice to the regulated public would be undermined by a policy that permits the enforcement agency to determine violations after-the-fact on a case-by-case basis using subjective or unknown criteria. *Id.*

The Borders moved for judgment on the pleadings in light of *Carter*. (DN20). The CFPB opposed the motion, arguing that the CFPB was no longer relying on the ten-factor test to support its claims. (DN42 at 3)("the Bureau's case . . . does not rely to any degree on the HUD Statement of Policy"). This contradicted what the CFPB told the Borders prior to suit, and it belied the allegations in the complaint.

The Court acknowledged that *Carter* invalidated the ten-factor "bona fides" analysis but denied the Borders' motion, finding that a factual dispute remained because the CFPB argued in briefing that the Title LLCs did not meet the three statutory elements of the safe harbor in 12 U.S.C. § 2607(c)(4). (DN59 at 4-5). In its briefing, the CFPB disputed whether the Borders gave written disclosures, whether the disclosures were sufficient/timely, and whether the LLC profit distributions were actually paid in accordance with ownership interest. (*Id.* at 7-8). Given these allegations, the Court cited the early stage of the case and the need for discovery to determine whether the Borders complied with RESPA. (*Id.* at 7-8).

**B. The CFPB evaded discovery about the basis for its claims.**

Following the Court's ruling, the parties engaged in extensive and one-sided discovery. The CFPB obtained expansive discovery from the Borders about the Title LLCs and hundreds of

real estate closings. The CFPB also subpoenaed nearly 40 third parties for documents and testimony. The vast majority of the CFPB's discovery requests, like the complaint, tracked the ten factors in Policy Statement 1996-2, not the statutory safe harbor elements in Section 8(c)(4) of RESPA. The Borders and subpoena targets made complete productions in 2014 and 2015. The CFPB took more than 20 depositions of the defendants and third party subpoena targets.

In contrast, when the Borders served multiple sets of interrogatory and document requests to the CFPB seeking the basis for the CFPB's allegations, the CFPB asserted blanket objections of undue burden, work product, law enforcement privilege, and deliberative process privilege and provided virtually no responses. (DN102-3 at Ex. D, p. 30-41). The CFPB's document production consisted of relabeling and reproducing production sets that the Borders and subpoena targets provided to the CFPB. The CFPB's interrogatory answers contained no substantive response, but rather referred to the general document productions and stated "the burden of deriving or ascertaining the answer is substantially the same for the Defendants as for the Bureau." (DN102-4 at 35-37; DN102-3 at Ex. B, p. 19-24; DN102-4 at Ex. J, p. 67-77; DN102-4 at p. 70-74). The Court's scheduling order (DN86) staggered dates for the completion of written discovery (November 2015) and depositions (January 2016). By Order entered January 4, 2016 (DN100), the Court extended these dates at the CFPB's request to February 15, 2016 for written discovery and April 14, 2016 for depositions. Nearing the close of fact discovery, the CFPB had not provided its contentions in the case.

**C. The Court ordered the CFPB to appear for a Rule 30(b)(6) deposition.**

On December 11, 2015, the Borders served the Rule 30(b)(6) deposition notice exploring the basis for the CFPB's theories. (DN102-2). The CFPB refused to appear, and filed a motion to quash. (DN102). In conjunction with its motion, the CFPB supplemented its interrogatory

responses and argued that its revised answers obviated the need for a deposition. The Borders opposed the motion to quash, explaining the need and relevance of each topic, and the need to bind CFPB with specific answers to specific questions. (DN106).

On June 29, 2016, this Court denied the CFPB's motion to quash and ordered the Rule 30(b)(6) deposition to proceed on 34 of the 38 topics. (DN119). The Court noted that "no express or implied exception to the Rule exists merely because the deponent is a government agency." (*Id*. at 10). The Court addressed each of the 38 topics, and ordered that the deposition go forward on all but 4 topics. The Court held that the CFPB need not produce a representative on Topics 14 and 15 regarding consumer harm based on the CFPB's representation that it intended to present no evidence of consumer harm or above market prices. (*Id*. at 18, n.2). The Court also held that Topics 8 and 9 called for hypothetical responses. The CFPB's motion to quash was denied with respect to the remaining topics. Although the Court rejected the CFPB's blanket privilege objections, the Court noted that the CFPB could, in good faith, assert any valid privilege objections during the deposition on a question-by-question basis.

### D. The CFPB failed to prepare testimony on the majority of topics and instructed its representative not to answer approximately 200 times.

Five months after the close of discovery, and nine months after the Rule 30(b)(6) notice was served, the CFPB produced Special Counsel for E-Discovery, Glen Melcher, as its representative. (*See* Rule 30(b)(6) Notice, Ex. 1, Transcript ("Melcher Depo"), Ex. 2). Mr. Melcher had no substantive involvement in the case or underlying investigation but rather brought a 58-page script as the sole basis for his testimony, along with several spreadsheets. (*Id.* at 14-15; "Script," Ex. 3). The Script contained a narrative position statement that largely repeated the generalized allegations from the CFPB's interrogatory responses. For many topics, no script or testimony was provided at all. Over the course of deposition, on the majority of

topics (addressed in detail below), Mr. Melcher either had no answers to the questions or was instructed by CFPB counsel not to respond. The CFPB asserted wholesale privilege objections on entire subject matters and topics, including its own factual contentions. As a result, the CFPB simply reasserted the blanket objections that the Court rejected when denying the motion to quash. There were roughly 200 instructions not to answer at the deposition.

## III. ARGUMENT

### A. Legal Standard

The Court's order of June 29, 2016 set forth in detail the obligations of a party to prepare Rule 30(b)(6) testimony. A Rule 30(b)(6) designee is obligated to provide binding testimony as to an entity's knowledge about topics identified in the deposition notice. *Janko Enters. v. Long John Silver's, Inc.*, 2014 U.S. Dist. LEXIS 185334, at *12 (W.D. Ky. Apr. 3, 2014). A Rule 30(b)(6) deponent must be prepared to testify about facts within the scope of the topics, even if those exceed the deponent's personal knowledge. *Id*. at *12-13. A designee is responsible for becoming educated about the identified topics. *Id*. at *13. Should that prove too difficult for one person, the entity may identify multiple Rule 30(b)(6) witnesses. *In re Classicstar Mare Lease Litig.*, 2012 U.S. Dist. LEXIS 50982, at *33 (E.D. Ky. 2012).

If a source of information is "reasonably available" to the entity, it must be mined for responsive answers. *Id*. at *14. Obtaining relevant documents from an entity's agents is therefore required. *QBE Ins. Corp. v. Jorda Enters.*, 277 F.R.D. 676, 696 (S.D. Fla. 2012). A deponent must conscientiously and in good faith prepare for the deposition by collecting and reviewing all relevant, obtainable information. *Janko*, 2014 U.S. Dist. LEXIS 185334, at *16. Moreover, a deponent must be prepared to testify about each topic in a deposition notice regardless of whether related documents have already been produced. *Id.*

` "Like any ordinary litigant, the Government must abide by the Federal Rules of Civil Procedure. It is not entitled to special consideration concerning the scope of discovery, especially when it voluntarily initiates an action." *SEC v. Collins & Aikman Corp*., 256 F.R.D. 403, 414 (S.D.N.Y. 2009). Rule 30(b)(6) applies to all "governmental agenc[ies]."

The Court's June 29, 2016 Order "rejects the position of the Bureau that a Rule 30(b)(6) deposition per se imposes an undue burden on the governmental agency. The Bureau has elected to bring suit against the Defendants. In doing so it has subjected itself fully to all of the controlling provisions of the Federal Rules of Civil Procedure including those that relate to discovery and Rule 30(b)(6)." (DN119 at 12). "The mere fact that the United States has provided some discovery responses does not relieve it of its obligation under Rule 30(b)(6) to provide a witness to answer questions about those documents for purposes of clarification and interpretation." *United States v. Educ. Mgmt. LLC*, 2014 U.S. Dist. LEXIS 48841, *9 (W.D. Pa. Apr. 9, 2014). A government agency "cannot dictate what discovery devices defendants may use to obtain information" and cannot use interrogatory answers as a substitute for Rule 30(b)(6) testimony. *United States ex rel. Fry v. Health Alliance of Greater Cincinnati*, 2009 U.S. Dist. LEXIS 122533 at *10-11 (S.D. Ohio Nov. 20, 2009). "Parties are entitled to test assertions in questioning witnesses during depositions, and it is fundamental that parties may simultaneously utilize any or all of the discovery mechanisms authorized by the rules." *Id.* (internal citations and quotes omitted); *see also SEC v. Merkin*, 283 F.R.D. 689, 695 (S.D. Fla. 2012)("the Government cannot insist that the defendant instead only issue interrogatories to obtain the information");

The Court's June 29, 2016 Order already warned the CFPB that an "agency that provides [an unprepared] Rule 30(b)(6) designee, who testifies during deposition that the corporation or the agency does not know the answers to the questions, will not be allowed effectively to change

its answer by introducing evidence at trial." (DN119 at 9)(internal citations omitted). The Court further warned that "[t]he failure of an agency or a corporate deponent to properly designate a Rule 30(b)(6) witness can be deemed a nonappearance that will justify the imposition of sanctions." *Id.*, *citing Resolution Trust Corp. v. So. Union Co., Inc.*, 985 F.2d 196, 198 (5th Cir. 1993). The government "simply cannot take the position during discovery that 'these defendants know what they did wrong and so why should we tell them what we think they did.'" *FDIC v. Butcher*, 116 F.R.D. 196, 200 (E.D. Tenn. 1986).

Nor can any civil litigant use privilege as "both a sword and shield" to prevent examination of the affirmative evidence allegedly supporting its claims. *Wilkinson v. Greater Dayton Reg'l Transit Auth.,* 2014 U.S. Dist. LEXIS 64522 (S.D. Ohio May 9, 2014)("a litigant cannot use the work product doctrine as both a sword and shield by selectively using the privileged [information]to prove a point but then invoking the privilege to prevent an opponent from challenging the assertion.") quoting, *Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 695, 704 (10th Cir. 1998).

Blanket law enforcement privilege objections are improper. *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1328 (M.D. Fla. 2011); *see also EEOC v. LifeCare Mgmt. Servs., LLC,* 2009 U.S. Dist. LEXIS 21224 (W.D. Pa. Mar. 17, 2009)(deeming "without merit" the argument that the deposition is not necessary because the agency already provided its investigative file and rejecting the agency's unilateral declaration that all other information is privileged). Notwithstanding any privilege the government might otherwise have, "[l]itigants are permitted to learn the facts underlying their opponent's claims and defenses." *Merkin*, 283 F.R.D. at 698. Like any civil party, "the [agency] must designate a representative who can be prepared to testify on the relevant facts of the investigation that are known or reasonably available." *A.R. v. Dudek*,

2015 U.S. Dist. LEXIS 6426 (S.D. Fla. Jan. 15, 2015). "[T]he argument that a lawyer would be involved in the preparation process is simply a truism which, if sufficient to preclude 30(b)(6) depositions, would eliminate that discovery tool." *Merkin*, 283 F.R.D. at 696; *see also Health Alliance*, 2009 U.S. Dist. LEXIS 122533 ("the fact that government attorneys are the only individuals with the requisite knowledge to answer Defendant's questions does not prevent them from preparing a designee to answer the questions").

"It seems fundamental that a defendant should be able to inquire into the facts upon which [the government] relies in support of its complaint." *Dudek*, 2015 U.S. Dist. LEXIS 6426, at 10-11 (ordering Rule 30(b)(6) deposition whereby "the United States must designate a representative who can be prepared to testify on the relevant facts of the investigation that are known or reasonably available to the United States").

A representative witness who is unable, unwilling, or unprepared to give useful information has been held to be "no more present for the deposition than would be a deponent who physically appears for the deposition but sleeps through it." *Blackhorse Lane Ass'n, L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 305 (3rd Cir. 2000). *See also, Kovad Communications Co. v. Revonet, Inc.*, 267 F.R.D. 14, 24-25 (D.D.C. 2010)("a corporate party's failure to educate its 30(b)(6) witness with respect to the corporation's full knowledge of topics noticed for the deposition is effectively a failure 'to appear for the purposes of Rule 37(d).'")(*quoting In re Vitamins Antitrust Litigation*, 216 F.R.D. 168, 174 (D.D.C. 2003)).

When an unprepared or non-responsive representative is presented, Rule 37(d) authorizes the Court to enter any of the corrective orders set forth in Rule 37(b)(2)(A)(i)-(vi). *Starlight Int'l, Inc. v. Agrlihy*, 186 F.R.D. 626, 639-40 (D.Kan. 1999); *United States v. Taylor*, 166 F.R.D. 356, 363 (M.D.N.C. 1996). This includes orders "directing that the matters embraced in the order or

other designated facts be taken as established for purposes of the action, as the prevailing party claims;" "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;" "striking pleadings in whole or in part;" and "dismissing the action or proceeding in whole or in part." FRCP 37(b)(2)(A). Courts routinely bind entities to their Rule 30(b)(6) testimony, and preclude entities from changing their answers or introducing new evidence at trial. *QBE*, 277 F.R.D. at 690; *Ierardi v. Lorillard,* 1991 U.S. Dist. LEXIS 11320, at *8 (E.D. Pa. 1991).

**B. The CFPB must be bound to its testimony and precluded from offering evidence on topics for which it either failed or refused to answer.**

**1. The CFPB's contentions of alleged RESPA violations (Topics 1-2)**

The first set of topics addresses the specific factual contentions of the CFPB's claims. The CFPB brought this suit under RESPA Section 8(a), which provides: "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 USCS § 2607. Topics 1 and 2 address the core RESPA elements for each subject transaction.

> *1. The identity of each real estate closing in which the CFPB contends the Borders committed a RESPA violation.*
>
> *2. The contentions and basis for each RESPA violation that the CFPB alleges the Borders committed, including identification of (1) the closing transaction at issue, (2) the allegedly referred party, (2) the allegedly referring party, (3) the alleged thing of value, (4) the settlement service allegedly referred, (5) the method of alleged referral, and (6) any facts, documents, witness statements, or testimony that the CFPB contends support its allegations.*

(DN102-2).

The need for particularized contentions on these elements is confirmed by the recent decision of the CFPB's own director in *In RE PHH Corp., et al*, 2014-CFPB-002 (June 4, 2015), which acknowledges that "violations of Section 8 of RESPA are individually actionable" on a

closing by closing basis. (DN92-2). RESPA claims must be addressed with respect to each individual closing transaction. *See Ford v. New Century Mortg. Corp.*, 797 F. Supp. 2d 862, 869 (N.D. Ohio 2011)("A RESPA violation occurs when the loan closing takes place"). As part of its burden of proof, the CFPB must identify the subject transactions and the factual basis for each alleged violation—including the identity of the referring and referred party, and the method of alleged referral. "Defendants should not be forced to guess how they each violated RESPA." *Lane v. Vitek Real Estate Indus. Group*, 713 F. Supp. 2d 1092, 1101-1102 (E.D. Cal. 2010); *see also Butcher*, 116 F.R.D. at 201 (Ordering FDIC deposition, noting: "[D]iscovery is available to avoid 'trial by ambush.' The time has come for the FDIC to get very specific about the loans for which it is claiming damages, about its contentions regarding why defendants are liable for those damages and about the amount of loss claimed for each loan.")

The Court's June 29, 2016 Order addressed the importance and propriety of these topics:

> *The Court agrees with the Defendants that these initial topics run to the "core elements of a RESPA claim and the safe harbor." Because each of the allegedly suspect closing transactions is the potential basis for a RESPA violation, as the Director of the CFPB recently acknowledged in [PHH], Defendants are entitled to know the factual basis for each of the alleged violations for each of the subject transactions which individually constitute the basis for an alleged violation of §8 of RESPA. . . . While the initial deposition topics may involve potentially hundreds of files, this magnitude is unavoidable given the nature of the CFPB's own claims. It would be decidedly ironic if the CFPB could rely upon the very magnitude of its own allegations to avoid providing proof to support them.*

(DN119 at 14-15)(internal citations omitted).

At the Rule 30(b)(6) deposition, the CFPB produced a spreadsheet for the first time identifying 584 real estate loan closing transactions in which the CFPB contends a RESPA violation to have occurred. (Melcher Depo. at 21 and Closing Spreadsheet Excerpt, Ex. 4). These 584 closings represent a subset of the more than 700 closings in which the Title LLCs wrote insurance policies during the relevant timeframe. The CFPB did not specify these closings

during discovery, despite having the Borders' document productions for years. Nonetheless, based on the belated testimony, the Borders seek to bind the CFPB to this identification of closings allegedly at issue, and preclude the CFPB from changing its contentions to make arguments about transactions not identified on the spreadsheet.

Although the spreadsheet identifies closings, it does not provide the element-by-element facts required by Topic 2. The spreadsheet does not provide the identity of the allegedly referred party, the referring party, the alleged "thing of value," the method of referral, or the specific facts. The CFPB's witness admitted that the spreadsheet did not have this information, such as the name of the person allegedly making a "referral." (Melcher Depo. at 56-61)("They are not explicitly stated in the spreadsheet, that is correct"). The CFPB was unprepared to identify the specific elements for a Section 8(a) claim for any of the 584 transactions at issue:

> *Q. And sitting here today as the CFPB's 30(b)(6) representative, you do not know what the amount thing of value the CFPB alleges for this transaction, do you?*
>
> *A. For this specific transaction?*
>
> *Q. Yes.*
>
> *A. No.*
>
> *Q. Or any specific transaction in this chart, do you?*
>
> *A. No.*
>
> *Q. Do you know anything specific about these transactions , other than what's in this chart?*
>
> *A. No. No, I amend my answer, and the information that's provided on Exhibit 201.*

(Melcher Depo. at 60-62).

The Court already held that identification of these core elements on a closing-by-closing basis is a critical component of the CFPB's burden of proof, and that the disclosure was necessary for the Borders to identify relevant witnesses and otherwise prepare its defense to rebut the claims. (DN119 at 14-15).

More importantly, the CFPB's general contentions on these core elements were a moving target throughout the case up to and including the deposition. When the Borders attempted to question Mr. Melcher generically about the CFPB's theories, his testimony changed within the course of the deposition. At one point Mr. Melcher testified emphatically that mortgage lenders, not borrowers, were the party receiving the referral for purposes of every transaction in the CFPB's claims. (*Id*. at 56-57)("generally, the referral was made to a lender"). Later, Mr. Melcher made a 180 degree reversal, revising his testimony and stating that consumers or borrowers were the party being referred for all the transactions at issue:

> *Q. Well, let me ask again, who is the referred party in this case?*
>
> *A. The customers are the referred party.*
>
> *Q. Who is the customer?*
>
> *A. The purchaser of the property.*
>
> *Q. The purchaser, not the lender?*
>
> *A. Yes.*
>
> *Q. Okay. You testified the exact opposite before lunch. Are you aware of that?*
>
> *A. Then I was mistaken if I said that. But I think I did say that and then I corrected it when you asked me a later question.*

(Melcher Depo. at 109). This testimony wavered wildly throughout the deposition with Mr. Melcher himself acknowledging the inconsistency. (*Id*. at 89)("Wait. So if I stated before that the Borders were the referred party, then I was mistaken. The referred party is the purchaser.").

At multiple points, the CFPB objected and instructed its witness not to answer questions seeking to flush out the inconsistencies in the CFPB's contentions:

> *Q. So in this case, the name of the purchaser is Brian Hendrick?*
>
> *A. That's correct.*
>
> *Q. And is it your testimony the Borders are the - - the party making the referral?*
>
> *A. No. The joint venture partners were the person making the referral. . . .*

> *Q. And in this instance, Mr. Hendrick elected not to purchase title insurance, right?*
>
> *A. It's correct that the form shows he selected the box saying he did not request an owner's policy of title insurance.*
>
> *Q. So you have no evidence that he actually did purchase an owner's policy of title insurance from the Title LLC in this action, do you?*
>
> *A. The Bureau has no evidence that Mr. Hendrick bought an owner's title insurance policy, that's correct.*
>
> *Q. And in fact, it - - it appears that he elected not to buy a policy, right?*
>
> *A. That's what the form represents, yes.*
>
> *Q. So how is he the referred party?*
>
> *A. He was referred to Borders & Borders by the joint venture partner for closing-related services.*
>
> *Q. But Borders & Borders represented the lender in the closing, correct?*
>
> *A. I believe - -*
>
> *MS. IVEY-COLSON: Objection; calls for a legal conclusion. Mr. Melcher is not testifying here - - any information that he would have to render an opinion of the role the Borders played representing a party in a transaction would be information that he obtained advising - - providing advice to the team, and that's protected by the attorney-client privilege. I'm instructing the witness not to answer.*
>
> *MR. OWSLEY: Okay. So the CFPB is taking the position that it's privileged to reveal the CFPB's contention as to whether or not the Borders represented lenders in this closing, is that right?*
>
> *MS. IVEY-COLSON: As I stated, that calls for a legal conclusion.*

(Melcher Depo. 89-93).

The ambiguity and inconsistency about the "referred party" impacts the analysis of the Section 8(c) RESPA safe harbors. Without specifying the referred party, it is difficult to assess the CFPB's contentions concerning who was allegedly supposed to give and receive a disclosure form, and when. When asked that question at deposition, the CFPB again instructed its witness not to answer. (Melcher Depo. at 108, 122)("Q. Who was the disclosure supposed to be given to, in the CFPB's position? MS. IVEY-COLSON: Objection; calls for a legal conclusion. . .").

The CFPB also wavered on the identity of the "referring party." At one point, Mr. Melcher testified that the unnamed real estate brokers were the referring party, while later acknowledging that the complaint alleges that the Borders were making referrals:

> *Q. Please turn to paragraph 25 . . . Do you see the second sentence there which says, " when the Borders referred a customer to a Title LLC" ( sic) ?*
>
> *A. Yes.*
>
> *Q. So as written in the complaint, the CFPB contended that the Borders & Borders PLL - - or PLC was a referring party, right?*
>
> *A. It does state that Borders & Borders referred a customer.*
>
> *Q. Well, has that position changed?*
>
> *A. It also says that a joint venture partner or its employee referred a customer.*
>
> *Q. So who's the referring party, the joint venture partner or the Borders?*
>
> *A. For purposes of this spreadsheet, it's the joint venture partners.*

(*Id*. at 98-100)

When pressed in the context of a specific transaction, Mr. Melcher argued that the Borders were both the referring and referred party, paying a kickback to themselves:

> *Q. Is it the CFPB's contention that the Borders gave or received a kickback?*
>
> *MS. IVEY-COLSON: I''m going to ask if you can clarify the question, who - - if you' re talking about the individuals or the Borders & Borders, the law firm?*
>
> *MR. OWSLEY: I 'm asking the - - the defendants.*
>
> *A. Can you define the word kickback?*
>
> *Q. Do you know what a kickback is?*
>
> *A. I'd like to know how you're using it in this context.*
>
> *Q. I would like to know if it's the CFPB's position that - - whether the Borders gave or received a kickback, as that term is used in the complaint?*
>
> *A. Title LLC distributions were kickbacks to the parties that received them.*
>
> *Q. [W]ho gave the kickback that you're referring to there, if you know?*
>
> *A. Borders & Borders.*
>
> *Q. So your position is that the Borders & Borders law firm gave a kickback to Borders & Borders the individuals?*
>
> *A. If you are defining kickback as an improper payment in violation of RESPA, yes.*

(*Id*. at 125-26).

The ambiguity and evasiveness of the CFPB's claims are inexcusable given the six-year investigation and the Court's specific direction in its June 29, 2016 Order. Whatever conflicting theory the CFPB might try to pursue at trial, the CFPB did not sufficiently disclose its alleged elements or evidence on a closing by closing basis. Accordingly, the CFPB should be precluded from specifying that evidence for the first time at trial or during dispositive motion practice.

**2. Contentions regarding the safe harbor for affiliated businesses and the Borders' disclosure practices (Topics 3-7, 10)**

Regardless of the CFPB's ambiguous Section 8(a) contentions, Section 8(c)(4) of RESPA explicitly permits referrals in the context of Affiliated Business Arrangements. It creates a safe harbor allowing service providers to receive a return on an ownership interest in an affiliated service provider to which they refer or share business so long as three conditions are satisfied: (1) an appropriate disclosure of the affiliation is made to the consumer at the time of referral; (2) the consumer is not required to use the referred AfBA; and (3) payments to the AfBA owners are based on return on ownership. 12 U.S.C. § 2607(c)(4).

In order to sustain its claims, the CFPB must establish that the challenged activity falls outside the scope of the three safe harbor elements. Topics 3-7, and 10 of the Rule 30(b)(6) deposition sought the basis, if any, for the CFPB's contention that Borders' practices failed to meet the safe harbor elements:

> *3. For each alleged RESPA violation, the basis for the CFPB's contention that Borders are not entitled to the safe harbor for affiliated businesses set forth in 12 U.S.C. § 2607(c)(4), including any facts, documents, witness statements, or testimony that the CFPB contends support its position.*
>
> *4. The basis for the CFPB's contention, if any, that the Borders represented borrowers in the closing transactions at issue, including any facts, documents, witness statements, or testimony that the CFPB contends support its position.*

*5. The basis for the CFPB's contention that the Borders' "Affiliated Business Arrangement Disclosure" form (DN20-2) was insufficient for purposes of the affiliated business safe harbor set forth in 12 U.S.C. § 2607(c)(4), including any facts, documents, witness statements, or testimony that the CFPB contends support its position*

*6. The basis for the CFPB's contention, if any, that the Borders' "Affiliated Business Arrangement Disclosure" form was not provided in connection with the closing transactions at issue in the CFPB's Complaint (DN1), including any facts, documents, witness statements, or testimony that the CFPB contends support its position.*

*7. The basis for the CFPB's contention contained in paragraph 30 of the Complaint (DN1) that the Borders' "Affiliated Business Arrangement Disclosure" forms "represent a threat to the basic purpose of the disclosure, and were not provided at the time of referral," including any facts, documents, witness statements, or testimony that the CFPB contends support its position.*

*10. The basis for the CFPB's contention, if any, that the Borders' "Affiliated Business Arrangement Disclosure" was not given at or before the time of referral of settlement services to the "Title LLCs" (as defined in paragraph 9 of the Complaint, DN1).*

The Court held that these topics were fundamentally relevant and not unduly burdensome. (DN119 at 14-16). Indeed, the CFPB evaded judgment on the pleading with vague assertions that the Borders only "sometimes" gave disclosures and that the content of the disclosures were somehow a "threat to the basic purpose of the disclosure." (DN59 at 8-9). Yet when the Borders questioned the CFPB's representative at deposition, he either had no support for these positions or was instructed not to answer.

**a. The CFPB could not contest the Borders' disclosure practices.**

Mr. Melcher acknowledged that the Borders gave disclosures at closings, and had a systemic practice of doing so. (Melcher Depo. at 49, 83, 105-113)("The Bureau does not dispute that Borders gave documents that purport to be Affiliated Business Arrangement Disclosures at closings, that's correct"). The CFPB had no basis to dispute the authenticity of the over 700 Affiliated Business Disclosure forms that the Borders produced in discovery, and had no basis to dispute the Borders' sworn testimony that they gave disclosures in every closing at issue. (*Id*. at

83-84, 112-13)("A. I do not dispute that the Bureau -- that the Borders had a policy to provide a form that purported to be an Affiliated Business Arrangement Disclosure, yes").

When asked whether the CFPB received any evidence or testimony from any consumer in the relevant 584 closings who claimed not to have received the Borders' disclosure form, CFPB's counsel instructed the witness not to answer on grounds of "work product."

> *Q. You have no testimony from a customer that a form was not given?*
>
> *MS. IVEY-COLSON: Objection; work product. Instructing the witness not to answer.*
>
> *Q. And there will be no such testimony at trial, will there?*
>
> *MS. IVEY-COLSON: Same objection. Don't answer.*

(*Id*. at 113). Based on this testimony (and the instructions) the CFPB should be precluded from any further argument that disclosures were only "sometimes" given. It is clear that disclosures were given as a business practice in closings. The CFPB's statements in briefing at the outset of the case to evade judgment on the pleadings were without basis. (DN1 ¶25; DN59 at 7-8).

In fact, the CFPB's Rule 30(b)(6) script acknowledges that "Borders provided [disclosure forms] to consumers at closing because that was their [sic] first contact that the Borders had with the consumers." (*See* Script at 16). The script further noted that the Borders had an office-wide practice of "making sure the AfBA Disclosure was in the closing packet and the closing attorney would get it executed at the time of closing." (*Id*. at 17). The Borders agree with these statements and the admissions should be binding.

**b. The CFPB refused to explain how the content of the Borders' form was "a threat to the basic purpose" of the disclosure.**

When asked how the content of the Borders' disclosure form, which contains all the required elements in the statute, "represents a threat to the basic purpose of the disclosure" as

alleged in the Complaint (DN1, ¶ 30), CFPB counsel again instructed the witness not to answer and shut down questioning on the topic:

> *Q. Why does the lack of ownership percentages on an AfBA Disclosure form undermine the purpose of that form?*
>
> *MS. IVEY-COLSON: Objection; work product, attorney-client privilege. I'm instructing the witness not to answer.*
>
> *Q. Okay. Why does the lack of a customer acknowledgment box, in the CFPB's opinion, undermine the core purpose of a AfBA disclosure form?*
>
> *MS. IVEY-COLSON: Same objection. Don't answer.*
>
> *Q. Why does certain language in capitalized typography in the shop around block and variances in typography undermine the core purpose of an AfBA disclosure form, in the CFPB's opinion, in this case?*
>
> *MS. IVEY-COLSON: Same objection. Don't answer.*

(Melcher Depo. at 118-19).

The CFPB also had no evidence that any consumer was confused about the content of the disclosure form, and CFPB's counsel again obstructed questioning on that topic:

> *Q. The CFPB is not going to present any evidence at trial, is it, that any consumer was confused about the Borders' AfBA disclosure form, right?*
>
> *MS. IVEY-COLSON: Objection; work product. I'm -- don't answer.*
>
> *Q. The CFPB has no evidence that any consumer was confused about the Borders' AfBA disclosure form, does it?*
>
> *MS. IVEY-COLSON: Objection; work product. Don't answer.*

(Melcher Depo. at 122-23).

Based on this testimony, and the instructions, the CFPB should be precluded from arguing at trial or during summary judgment that any consumer who received the Borders' disclosure form was confused or misled about the disclosure, or that the content of the disclosure itself (which contains all the statutory elements) somehow "undermines the purpose" of the form.

**c. The CFPB refused to disclose its timing contention.**

As for Topic 10, concerning the timing of the AfBA disclosure, the CFPB's testimony was riddled with confusion because of the ambiguity in its contentions on the identity of the referred party, referring party, and the service referred. (Melcher Depo. at 115-119). Throughout the deposition, the CFPB wavered in its position as to whether a lender or consumer/borrower was the "referred party" and whether the Borders received or made the alleged referral. (see above). When pressed to specify these contentions, Mr. Melcher would make circular statements like: "the referral is made for purposes of the closing services that are -- closing services that are referred." (*Id*. at 119).

In the end, CFPB's counsel instructed Mr. Melcher not to disclose the CFPB's timing contention:

> *Q. So is it the CFPB's position than an AfBA disclosure form needs to be given to a consumer at the time a lender makes a decision to choose closing counsel?*
>
> *MS. IVEY-COLSON: Objection; calls for a legal conclusion. I'm going to instruct the witness not to answer any -- any position that he can come up with is based on information that he has in his capacity advising the team, and it's protected by attorney work privilege.*

(*Id*. at 119).

> *Q. Is it the CFPB's position, in this case, that customers - - and by customers, I mean buyers - - get to veto a lender's choice to close with the Borders?*
>
> *A. No. . . .*
>
> *Q. Why does an AfBA disclosure form need to be given at the time a lender chooses the Borders to close a transaction if a buyer has no right to veto a lender's choice of closing counsel?*
>
> *MS. IVEY-COLSON: I'm objecting based on Judge Whalin's striking of topics 8 and 9 , which discuss what - - what the Borders could have done differently to meet the requirements of the Safe Harbor. And I'm instructing the witness not to answer.*

(*Id*. at 122).

Through evasive answers and instructions, the CFPB refused to give a binding position on the timing element of the Section 8(c)(4) safe harbor. Defendants should not have to guess what the CFPB's contentions are. Accordingly, the CFPB should be precluded from challenging the sufficiency of the timing of the Borders disclosure or otherwise presenting its timing contention for the first time during dispositive motion practice or trial.

### 3. Contentions regarding the services provided by the Borders and Title LLCs and "substantive title work" (Topics 11-13)

Topics 11-13 address the CFPB's contentions, if any, regarding the work actually performed by the Borders and the Title LLCs in connection with the closings at issue:

> *11. The basis for the CFPB's contention, if any, that the Borders did not render legal services in connection with the closings at issue.*
>
> *12. The basis for the CFPB's contention, if any, that the Title LLCs did not issue title insurance policies in connection with the closings at issue.*
>
> *13. The basis for the CFPB's contention in paragraph 20 of the Complaint (DN1) that "Title LLCs did not perform substantive title work," and any facts, documents, witness statements, or testimony that the CFPB contends support its allegations.*

These topics are relevant to the additional safe harbors in RESPA Section 8(c). The purpose of RESPA is to curb the payment of unearned or excessive fees for settlement services. Sections 8(c)(1) and 8(c)(2) provide that nothing in RESPA shall prohibit the payment for settlement services actually rendered:

> *Nothing in this section shall be construed as prohibiting (1) the payment of a fee (A) to attorneys at law for services actually rendered or (B) by a title company to its duly appointed agent for services actually performed in the issuance of a policy of title insurance . . . (2) the payment to any person of a bona fide salary or compensation or other payment for goods or facilities actually furnished or for services actually performed.*

12 U.S.C. § 2607(c)(1), (c)(2). "[I]n the text and context of this statute, a bona fide payment means a payment of reasonable market value." *PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d 1, 41 (D.C. Cir. 2016). "Reasonable payments in return for services actually performed or

goods actually furnished are not intended to be prohibited ." *Id*. at 43 (citing legislative history). "It is the CFPB's burden to prove that the payments for [the services at issue] were more than reasonable market value and were disguised payments for referrals." *Id*. at 49.

There is no question that the Borders' law firm actually performed services in connection with each of the closings at issue and were paid for those services. The CFPB does not question that the Borders were paid fair market value for those services. In response to Topic 11, the CFPB's script acknowledges that the Borders provided closing services. (Script at 41). This admission should be binding (and dispositive) for purposes of application of the safe harbors in Section 8(c)(1) and 8(c)(2) regardless of the CFPB's shifting Section 8(a) theories.

There is also no dispute that the joint venture Title LLCs issued valid and binding title insurance policies and received fair market premium payments from issuance of those policies:

> *Q. [T]he CFPB does not dispute that a title policy was issued in connection with this - - a title insurance policy was issued in connection with this closing, does it?*
>
> *A. No, it does not.*

(Melcher Depo. at 62). In response to Topic 12, the CFPB's scripted answer admits that title insurance policies were issued "under the Title LLC company names." (Script at 41). Mr. Melcher conceded that the issuance of title insurance is a "settlement service" under 12 U.S.C. § 2602(3). (Melcher Depo. at 96). The CFPB's admission that insurance policies were issued by the Title LLCs should be binding (and dispositive) for all further proceedings.

At the Rule 30(b)(6) deposition, the CFPB also did not dispute the facts set forth in the affidavit of Danetta Mattingly, who operated the Title LLCs as an independent agent and underwrote each of the more than 1,000 title insurance policies issued by the Title LLCs. (Melcher Depo. at 64-66). The CFPB nonetheless contends that the work performed by Ms.

Mattingly was insufficient to constitute "substantive title work." The phrase "substantive title work" appears nowhere in RESPA, but is used the CFPB's Complaint. (DN1 ¶20).

Topic 13 of the 30(b)(6) deposition addresses that vague phrase as used in the complaint. The Court held that this was a proper subject of inquiry. (DN119 at 17). At deposition, however, the CFPB instructed its representative not to explain the phrase "substantive title work" as used in its claims against the Borders.

> *Q. What does substantive title work mean?*
>
> *MS. IVEY-COLSON: Objection; calls for a legal conclusion.*
>
> *Q. Is substantive title work a phrase that is used in RESPA?*
>
> *MS. IVEY-COLSON: Same objection.*
>
> *MR. OWSLEY: Instruction not to answer?*
>
> *MS. IVEY-COLSON: Sure, yes.*
>
> *Q. What is the meaning of substantive title work as used in paragraph 20 of the complaint?*
>
> *MS. IVEY-COLSON: Same objection. Don't answer.*
>
> *Q. What criteria does the CFPB use to determine whether or not something constitutes substantive title work?*
>
> *MS. IVEY-COLSON: Objection; work product, attorney-client privilege, law enforcement privilege. Don't answer.*
>
> *Q. Is there any internal policy statement at the CFPB that defines the term substantive title work?*
>
> *MS. IVEY-COLSON: Objection; law enforcement privilege, attorney-client privilege, deliberative process, work product. Don't answer.*
>
> *Q. Do you, in your individual capacity, know what the phrase substantive title work means?*
>
> *A. No.*
>
> *Q. Does the issuance of title insurance constitute, quote, "substantive title work"?*
>
> *MS. IVEY-COLSON: Objection. I'm instructing the witness not to answer.*

(Melcher Depo. at 123-24).

Given these instructions, the CFPB should be precluded from making arguments at trial or in motion practice about "substantive title work" in support of its claims against the Borders.

The phrase has no use or meaning in RESPA, it does not carry the force of law, and the CFPB refused any attempt to define it.

**4. The undefined phrases in the CFPB's allegations (Topic 16-25)**

Topics 16-25 address the CFPB's contentions regarding vague phrases—*sham*, *bona fide provider*, *bona fide return on ownership interest*, *accounting gimmick*, and *disguised profit distributions*—used the complaint and in briefing:

> *16. The basis for the CFPB's contention in paragraph 30 of the Complaint (DN1) that "the Title LLCs did not constitute bona fide 'providers of settlement services' within the meaning of RESPA," and any facts, documents, witness statements, or testimony that the CFPB contends support its allegations.*
>
> *17. The criteria or factors by which the CFPB evaluates whether an affiliated business does not constitute a bona fide provider of settlement services for purposes of application of the safe harbor set forth in 12 U.S.C. § 2607(c)(4), and the identity of any document, rule, policy, or publication (if any) which the CFPB contends puts the regulated industry on notice of said criteria or factors.*
>
> *18. The basis for the CFPB's contention stated on page 13 of DN42 that the Title LLCs were "shams," and any facts, documents, witness statements, or testimony that the CFPB contends support its allegations.*
>
> *19. The criteria or factors by which the CFPB evaluates whether an affiliated business is a sham for purposes of application of the safe harbor set forth in 12 U.S.C. § 2607(c)(4), and the identity of any document, rule, policy, or publication (if any) which the CFPB contends puts the regulated industry on notice of said criteria or factors.*
>
> *20. The basis for CFPB's allegation on page 2 of DN42 that the "Title LLCs were nothing more than accounting gimmicks," and any facts, documents, witness statements, or testimony that the CFPB contends support its allegations.*
>
> *21. The criteria or factors by which the CFPB evaluates whether an affiliated business is "nothing more than an accounting gimmick" for purposes of application of the safe harbor set forth in 12 U.S.C. § 2607(c)(4), and the identity of any document, rule, policy, or publication (if any) which the CFPB contends puts the regulated industry on notice of said criteria or factors.*
>
> *22. The basis for the CFPB's contention, if any, that the profit distributions paid by the Title LLCs to their respective owners were not returns on ownership interest, and any facts, documents, witness statements, or testimony that the CFPB contends support its allegations.*

> *23. The basis for the CFPB's contention in paragraph 30 of the Complaint (DN1) that payments "made to the Individual Defendants and the Joint Venture Partners did not constitute bona fide returns on ownership interest," and any facts, documents, witness statements, or testimony that the CFPB contends will support its position.*
>
> *24. The criteria or factors by which the CFPB evaluates whether a payment made by an affiliated business constitutes a bona fide return on ownership interest for purposes of application of the safe harbor set forth in 12 U.S.C. § 2607(c)(4), and the identity of any document, rule, policy, or publication (if any) which the CFPB contends puts the regulated industry on notice of said criteria or factors.*
>
> *25. The basis for the CFPB's contention in paragraph 2 of the Complaint (DN1) that "kickbacks – paid to owners and managers of local real estate and mortgage brokerage companies who referred business to Borders and Borders, PLC – were disguised as profit distributions," and any facts, documents, witness statements, or testimony that the CFPB contends will support its position.*

The CFPB invoked these phrases to survive dismissal, and is attempting to enforce them against the Borders as if they carry the force of law. These phrases do not appear in RESPA. The Rule 30(b)(6) topics address two issues about the phrases. First, the topics sought the basis, if any, for the CFPB's allegations. Second, the topics sought the identity of any document, rule, policy, or publication (if any) which the CFPB contends puts the regulated industry on notice of the criteria or factors defining these phrases. This is relevant to the Borders' Due Process defense, which was addressed in detail by the Sixth Circuit in *Carter*,

> *A single statute with civil and criminal applications receives a single interpretation. A bedrock principle of American law requires the government to give the people fair notice of what conduct it has made a crime. Even if we assume that a regulation that authoritatively interprets a statute with criminal applications provides fair warning, it is difficult to see how a mere policy statement or opinion letter or agency manual could be up to the task. The government's duty of fair notice precludes us from supplementing the safeguards expressed on the face of the statute with a multi-factor blend that the statute nowhere mentions*

736 F.3d at 727; *see also Whitman v. United States*, 135 S. Ct. 352, 352-354 (U.S. 2014)("legislatures, not executive officers, define crimes"), *citing Carter*; *PHH*, 839 F.3d at 46 ("[I]ndividuals should have an opportunity to know what the law is and to conform their conduct

accordingly. Due process therefore requires agencies to provide regulated parties fair warning of the conduct a regulation prohibits or requires.")(internal quotations omitted).

At the Rule 30(b)(6) deposition, CFPB's counsel asserted wholesale objections to these topics and instructed the witness not to answer:

> *Q. Let's turn to topic 19.*
>
> *A. ( Witness complies. )*
>
> *Q. Have you prepared any testimony in response to topic 19?*
>
> *A. There is no written testimony on the memory aid.*
>
> *Q. What criteria or factors does the CFPB evaluate whether an affiliated business is a sham for purposes of application of the Safe Harbor set forth in RESPA 8(c)(4) ?*
>
> *MS. IVEY-COLSON: Objection; deliberative process, law enforcement privilege. Don' t answer.*
>
> *Q. As the representative of the CFPB, which is the regulator in this industry, can you identify any document, rule, policy or publication which the CFPB contends puts the regulated industry notice - - on notice of any criteria or factors as to whether an affiliated business is a sham, for purposes - - for purpose of application of the Safe Harbor in RESPA Section 8(c)(4) ?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*
>
> *Q. As the CFPB's representative today, can you identify any document, rule, policy or publication which the CFPB contends puts the regulated industry on notice of the criteria or factors that determine whether something is an accounting gimmick?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*
>
> *Q. And you've prepared no testimony today on that subject, have you?*
>
> *A. There's no prepared testimony on the memory aid, that's correct.*
>
> *Q. And you've prepared no written testimony on topics 22, 23, 24, 25, 26 - -*
>
> *A. I believe topics 22 and 23, we reference topic 18, and I believe our answer is the same.*
>
> *Q. And there is no prepared testimony on any of those topics, right?*
>
> *A. That's correct.*
>
> *Q. Can you identify the criteria or factors by which the CFPB evaluates - evaluates whether an affiliated business is a bona fide provider of settlement services, for purpose of application of the Safe Harbor set forth in RESPA 8(c)(4) ?*

> *MS. IVEY-COLSON: Objection; deliberative process, law enforcement. Don' t answer.*
>
> *Q.* []*As the CFPB's representative here today, can you identify any document, rule, policy or publication, if any, which the CFPB contends puts the regulated industry on notice of the criteria or factors by which the CFPB evaluates whether an affiliated business is a bona fide provider of settlement services?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*
>
> *Q. As the CFPB's corporate representative, can you identify the criteria or factors by which the CFPB evaluates whether a return on ownership interest is bona fide?*
>
> *MS. IVEY-COLSON: Objection; deliberative process, law enforcement privilege. Don' t answer.*
>
> *Q. As the CFPB's corporate representative today, can you identify any document, rule, policy or publication, if any, which the CFPB contends puts the regulated industry on notice of what a bona fide return on ownership interest is?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*

(Melcher Depo. at 166-69).

The CFPB's refusal to disclose contentions on these topics should be binding on all further proceedings, including the Borders' summary judgment motion, which will address the lack of identifiable criteria or standards given to the regulated public. In effect, the CFPB claims that privilege allows it to enforce unpublished "laws" based upon unknown criteria without disclosing those "laws" until after it has unilaterally pronounced a violation. Advance public notice of the law is constitutionally required so that the regulated parties can conform their conduct to the law, rather than be subject to regulation through interpretive enforcement.

Not only did the CFPB refuse to explain what the phrase "accounting gimmick" means, the CFPB refused to disclose whether it has even done an accounting analysis of the financial records produced by the Borders:

> *Q. And does the CFPB dispute that this $ 967, that is referenced on this disbursement sheet, was actually given to Leo Title, to your knowledge?*

> *A. So the CFPB does not dispute that. The information that is on this worksheet is the information that's on this worksheet. CFPB does not have transaction by transaction payments to the Title LLCs, because I do not believe that they either were produced or existed.*
>
> *Q. Well, you have this document right here, right?*
>
> *A. I do.*
>
> *Q. And this document reflects a payment to Leo Title for title insurance?*
>
> *A. It reflects that a payment - - it - - it does in fact say what it says, that there is a disbursement there. It doesn't say that it was actually received, it doesn't say that the check was ever actually cut. It says that it - - this is the disbursements that were made.*
>
> *Q. Well, the CFPB has all the checks, don't they?*
>
> *A. I - - as I've stated, I haven't reviewed every single document that was produced.*
>
> *Q. Did anybody at the CFPB review the documents that were produced?*
>
> *MS. IVEY-COLSON: Objection; work product. I ' m instructing the witness not to answer.*
>
> *Q. Did the CFPB make any effort to correlate the checks that the Borders produced with the disbursements on any of the closing files?*
>
> *MS. IVEY-COLSON: Same objection.*
>
> *Q. Did the CFPB conduct a forensic accounting of the documents produced in this case?*
>
> *MS. IVEY-COLSON: Same objection.*
>
> *MR. OWSLEY: Instruction not to answer?*
>
> *MS. IVEY-COLSON: Yes.*

(Melcher Depo. at 47-48).

It would be monumentally unjust to allow the CFPB prosecute a RESPA claim premised on "accounting gimmicks" (*see* DN42 at 2) when, (1) the CFPB cannot even explain that term and (2) the CFPB refused to disclose whether it conducted any analysis to substantiate or refute the undefined allegation. Regardless, the CFPB produced no accounting analysis in discovery or in its Rule 30(b)(6) testimony. Nor did the CFPB produce any forensic accounting in its purported expert report. The CFPB cannot be permitted to present theories or evidence regarding accounting practices for the first time at trial. After six years of investigation, the

CFPB prepared nothing to substantiate its bare claims. The CFPB's vacuous Rule 30(b)(6) testimony must be binding.

There was nothing irregular with the accounts of the Title LLCs. Mr. Melcher acknowledged that the CFPB had no reason to question any of the work done by the outside accountant of the Title LLCs, Barry Christensen of Louis T. Roth & Co., who prepared yearly tax returns for each entity, including the Federal K-1 disclosure forms accurately reflecting the returns on ownership interests for each member:

> *Q. I'm going to hand you what has previously been marked as Exhibit 112. Let me just ask you, did you review any of the tax returns for the Title LLCs?*
>
> *A. I did not.*
>
> *Q. Did you see any of the tax returns for the Title LLCs?*
>
> *A. I may have seen them. I did not review them.*
>
> *Q. So does the CFPB dispute that each Title LLC filed its own tax returns ?*
>
> *A. No.*
>
> *Q. And you see that these tax returns were prepared by a third party accountant, do you see that?*
>
> *A. Yes, I see that.*
>
> *Q. Is the CFPB accusing this accountant, Barry J . Christensen of wrongdoing?*
>
> *A. I don' t think that the - - the CFPB is in a position to state that one way or the other. I - - he stated here that he prepared it.*
>
> *Q. Is the CFPB contending that Barry Christensen engaged in, quote, "accounting gimmicks" in connection with the filing of this tax return?*
>
> *A. No.*

(*Id*. at 136-37, 143). These admissions should also be binding for all further proceedings.

**5. Contentions about the policy invalidated in *Carter* (Topics 26-30)**

Topics 26-30 sought testimony under oath as to whether the CFPB is still enforcing HUD Statement of Policy 1996-2 in this lawsuit and whether HUD Statement of Policy 1996-2 is the source of the allegations against the Borders (as the CFPB stated in its pre-suit investigation):

> *26. Whether the CFPB currently follows HUD Statement of Policy 1996-2 when enforcing RESPA.*
>
> *27. Whether the CFPB is following or has followed HUD Statement of Policy 1996-2 in this enforcement action against the Borders.*
>
> *28. Whether the CFPB contends that HUD Statement of Policy 1996-2 is a valid and enforceable interpretation of RESPA.*
>
> *29. Any efforts or discussion within the CFPB to amend, change, update, or abandon HUD Statement of Policy 1996-2, or to enact new rules concerning the subject matter of HUD Statement of Policy 1996-2, following the Sixth Circuit's decision in Carter v. Welles-Bowen Realty, Inc., 736 F.3d 722 (6th Cir. 2013).*
>
> *30. Whether the CFPB has followed HUD Statement of Policy 1996-2 when enforcing RESPA since the Sixth Circuit's decision in Carter v. Welles-Bowen Realty, Inc., 736 F.3d 722 (6th Cir. 2013).*

These topics are relevant to the application of the *Carter* decision. Obviously, if the CFPB is continuing to enforce in this lawsuit a policy that the Sixth Circuit invalidated four years ago, that is the proper subject of inquiry and dispositive motion.

At deposition, the CFPB objected to every question under these topics and instructed its witness not to answer:

> *Q. Is it the CFPB's position today that HUD policy statement 1996- 2 is valid?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*
>
> *Q. Is the CFPB enforcing HUD policy statement 1996- 2 in this lawsuit?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*
>
> *Q. Isn't it true that the CFPB referenced HUD policy statement 1996- 2 in its pre-suit investigation communications with the Borders?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*
>
> *Q. Isn't it true in the pre-suit investigation that the CFPB accused the Borders of failing to meet the 10 factors in HUD policy statement 1996- 2 ?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*
>
> *Q. Is the CFPB basing its claims in this case on any of the factors listed in HUD policy statement 90 - - 1996- 2 ?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*

(Melcher Depo. at 131-32). It is obvious that the CFPB's claims in this case are based on the policy that *Carter* invalidated. The CFPB failed to refute this at deposition and that failure should be binding for dispositive motions.

**6. The substantial delay in the CFPB's investigation (Topic 31)**

The Borders were fully transparent about their operation of the affiliated businesses at issue. This was reflected in their disclosure practices, the tax returns prepared by their outside certified public accountant, and their financial records. The Borders openly provided this documentation to HUD and the CFPB from the outset of the investigation. Yet the CFPB waited years to file suit, during which time its theories of violation were a moving target. Topic 31 addressed the CFPB's investigation. The CFPB refused to provide any explanation regarding the substantial delay in its investigation of the Borders.

> *Q. Does the CFPB dispute that the HUD - - or that HUD began this investigation sometime in the middle of 2010?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*
>
> *Q. Do you know why there was a three-year delay, between this initial document logged in this privilege log and the filing of a complaint?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*
>
> *Q. Was there a delay because there was disagreement within HUD as to whether the Borders violated RESPA?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*
>
> *Q. Was the delay because the Carter case was going up through the court system?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*
>
> *Q. Was there a delay because there was a concern within HUD or the CFPB, that HUD policy statement 1996- 2 was invalid?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*

(Melcher Depo. at 130-31).

The CFPB's Complaint seeks injunctive and equitable relief. The CFPB's refusal to explain its substantial delay in the investigation should be binding and mitigate against any allegation of irreparable harm or any claim for equitable relief.

**7. The CFPB's purported witnesses and evidence (Topics 32-34)**

Through its initial Rule 26 disclosures and five supplements, the CFPB identified a large number of third parties "likely to have discovery information that the Bureau may use in support of its claims," but did not disclose the subject matter of that information. The CFPB's discovery responses incorporated its Rule 26 disclosures but again failed to identify the subject matter or relevance of any potential testimony of these individuals. The Borders were aware that the CFPB contacted individuals outside the subpoena and discovery process. The CFPB had not accounted for information received from those interviews, or any statements or affidavits.

On June 29, 2016, upon the Borders' motion, this Court applied Rule 37(c)(1) and sanctioned the CFPB, striking 561 individuals and the unidentified "lenders" from the CFPB's supplemental Rule 26 disclosures because the disclosures were deficient and untimely. (DN120). The Court noted that it would be "a clear example of unfair prejudice to the Borders" if the CFPB were to disclose facts from these witnesses for the first time in response to a dispositive motion. (DN120 at 13).

Topics 32-34 of the Rule 30(b)(6) deposition address witness statements and facts from any of the other dozens of individuals summarily listed in the CFPB's disclosures and discovery responses as allegedly having evidence supporting the CFPB's claims:

> *32. Any witness statements obtained by the CFPB in connection with this lawsuit and the preceding investigation.*
>
> *33. The identity of each individual contacted by the CFPB in connection with this lawsuit and the preceding investigation.*
>
> *34. The statements contained in the CFPB's responses to the Borders' interrogatories.*

The CFPB objected to every question regarding these alleged witnesses and refused to disclose any evidence allegedly supporting the CFPB's claims obtained from these individuals. (Melcher Depo. at 169-193). Below is a sampling of the 25 pages of such testimony:

> *Q. Does the CFPB contend that Anne Scholtz Heirn has discoverable information in this lawsuit?*
>
> *A. Well, each of these individuals was listed as people that were likely to have discoverable information.*
>
> *Q. Each of the individuals identified in all of the Rule 26 disclosures, right?*
>
> *A. That's right.*
>
> *Q. Okay. Has the CFPB contacted Anne Scholtz Heirn?*
>
> *MS. IVEY-COLSON: Objection; work product. Don' t answer.*
>
> *Q. Has the CFPB interviewed Anne Scholtz Heirn?*
>
> *MS. IVEY-COLSON: Same objection; also law enforcement privilege. Don' t answer.*
>
> *Q. Has the CFPB obtained a statement from Anne Scholtz Heirn?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*
>
> *Q. Has the CFPB obtained any evidence from Anne Scholtz Heirn to support its contentions in this lawsuit?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*

(*Id*. at 171-72).

> *Q. [] What is Kentuckiana Technologies?*
>
> *A. Sitting here right now, I don' t know. It was an entity that at the time we filed this initial disclosure, we believed had discoverable - - potentially had discoverable information.*
>
> *Q. Did the CFPB contact Kentuckiana Technologies?*
>
> *MS. IVEY-COLSON: Objection; work product, law enforcement privilege. Don' t answer.*
>
> *Q. Did the CFPB obtain any evidence from Kentuckiana Technology to support its claims in this lawsuit?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer*

(*Id*. at 172).

> *Q. Do you know who any of these people listed through - - in 6 through 9 are? And I 'll just say them, Maxwell Minzenberger, Brian Linde, Aaron Hill and Meg Panella?*
>
> *A. Again, they're individuals that have been identified as potentially having information relevant to claims or defenses in this case.*
>
> *Q. Anything else?*
>
> *A. No.*
>
> *Q. And you've prepared no written testimony about these people?*
>
> *A. That's correct.*
>
> *Q. And do you know whether the CFPB interviewed them?*
>
> *MS. IVEY-COLSON: Objection; law enforcement privilege, work product. Don' t answer.*
>
> *Q. Obtained any statements from them?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*
>
> *Q. Obtained any evidence from them to support its allegations in this matter?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*

(*Id*. at 177-78).

When asked whether the CFPB had obtained any affidavits that had not been produced to the Borders, the CFPB refused to answer:

> *Q. Has the CFP - - CFPB solicited affidavits from any of the individuals who have been identified in the CFPB's discovery responses?*
>
> *MS. IVEY-COLSON: Objection; work product. Don' t answer.*
>
> *Q. Well, the CFPB has drafted affidavits and given them to people, haven't they?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*
>
> *Q. Does the CFPB have any signed affidavits from any individuals?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*
>
> *Q. Is the CFPB withholding any affidavits?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*
>
> *Q. Does the CFPB intend to use any affidavits in the future that it has not currently disclosed to the Borders?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*

(*Id*. at 163-64).

In total, the CFPB refused to disclose in its Rule 30(b)(6) deposition any alleged evidence supporting its claims from 45 persons and entities listed in the CFPB's own Rule 26 disclosures. (*Id*. at 169-93).[1] That refusal should be binding. For the same reasons articulated in the Court's June 29, 2016 sanctions order (DN120), the CFPB must be precluded from presenting affidavits or testimony from these people as part of its affirmative case.

**8. The CFPB's claims for monetary and injunctive relief (Topics 37-38)**

Topics 37 and 38 explore the computation for the CFPB's claim of monetary relief, and the basis for any claim of irreparable harm:

> *37. A complete computation of the monetary relief sought from the Borders in connection with the CFPB's asserted RESPA violations, and the complete basis for the computation, including any facts, documents, witness statements, or testimony that the CFPB contends support its position.*
>
> *38. The basis for the CFPB's contentions, if any, regarding "irreparable harm" and the CFPB's demand for injunctive relief.*

The CFPB objected to disclosing any evidence supporting a contention of irreparable harm: (Melcher Depo. at 163)("Q. There will be no evidence at trial, of irreparable harm to consumers, will there? MS. IVEY-COLSON: Same objection. Don't answer."). This testimony should be binding and the CFPB should be precluded from introducing any argument or evidence of "irreparable harm" in support of its claims for injunctive or equitable relief.

As for monetary relief, the CFPB's Rule 26 disclosures and written discovery responses provided no computation or calculation of the monetary relief sought from the Borders. Rule 26(a)(1)(A)(iii) places an affirmative obligation on plaintiffs to disclose "a computation of each

---

[1] The persons and entities are Anne Scholtz Heim (now Anne P. Scholtz), Kentuckiana Technologies, PropertyInfo, Barry Christensen, David Biscoff, Kelly Johnson, Maxwell Minzenberger, Brian Linde, Aaron Hill, Meg Panella, Scott Panella, Perry Thomas, Joseph Guy Hagan, Jerry Daniel, Harriet Conely, Patricia Anne Radcliff, Patricia Duncan, Natalie Bajandas, Colleen Young, Robert B. Fry, Mike Berman, Pat Parks, Judie Parks, Frank Weisberg, Michael Weisberg, Jerry Ward, Kentucky Department of Insurance, Robert Wasserman, Jim Stipanovich, Dennis Hines, Craig Hall, Mark Turner, David Halpern, Stacey Sherrard, Barbara Burress, Tom Donnelly, Kelli Ann Wimsat, Rebel M . Lee, Stephanie L .Horne, Natalie K . Richards, Dianne H. Sadtler, Stacy L . Bauer, Jeanette Perkins, Lynda Wilcox, and Michelle Rawn.

category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based."

At the Rule 30(b)(6) deposition, the CFPB provided a one page bullet point summary purporting to tabulate the $549,432. 51 that CFPB is attempting to disgorge from the Borders. (Melcher Depo. at 156, Script at 56-57). When asked to explain the calculation, and whether it included closing fees beyond the 584 transactions allegedly at issue, Mr. Melcher did not know because he was not involved in the preparation of the document. When asked if the CFPB had some other person who could explain the calculation and or otherwise lay foundation for any attempt to admit the document at trial, the CFPB instructed Mr. Melcher not to answer:

> *Q. Is the second checkmark/bullet point there, is that limited to 584 transactions?*
>
> *A. So - - yeah, and - - and - - and the answer is, that it was the information from the cash summary spreadsheets that the defendants produced. There - - I understand that it was not 100- percent clear if those spreadsheets also included some cash transactions or not.*
>
> *Q. So the document cited in that second bullet point appear to be the K-1s, right?*
>
> *A. Yes.*
>
> *Q. So those are the K - 1 s from all of the tax returns for the Title LLCs, right?*
>
> *A. Correct.*
>
> *Q. And the tax returns reflect the total revenue of those Title LLCs, right?*
>
> *A. That's correct.*
>
> *Q. The Title LLCs were involved in more than 584 closings, weren't they, during the statutory period?*
>
> *A. I believe that's correct.*
>
> *Q. So bullet point number 2 is not limited to the 584 eligible transactions, is it?*
>
> *A. As I said previously, it was not clear whether all of those transactions or if there were other transactions that were included. So that is correct.*
>
> *Q. Not clear to who?*
>
> *A. Not clear to the individual that prepared this document. . . .*

> *Q. And who's that individual?*
>
> *MS. IVEY-COLSON: Objection; work product, law enforcement privilege. Don' t answer.*
>
> *Q. That individual is not intending to give testimony at trial, are they?*
>
> *MS. IVEY-COLSON: Same objection. Don' t answer.*

(Melcher Depo. at 157-59).

The CFPB failed to provide its calculation for monetary relief pursuant to Rule 26 for the entire period of fact discovery. It also produced no expert report on the subject. When the CFPB produced is computation for the first time at its Rule 30(b)(6) deposition, the CFPB's representative could not explain the calculation or lay foundation for it. Given the privilege objections, the person who created the calculation is not even known. Based on the CFPB's lack of prepared testimony and its instructions, the calculation must be excluded from consideration at trial. The Borders have been deprived of any opportunity to challenge the method and scope of the calculation, or even discern the methodology. This result is strictly forbidden by the Rules 26(a)(1)(A) and 37(c)(1) in addition to Rule 30(b)(6). "In an adversarial proceeding, a process designed to reach the truth of the matter through the presentation of opposing perspectives, justice does not permit one side to inform and facilitate a damages assessment, purposed for the reliance of the court, without permitting its opponent access to the materials and process underlying the assessment." *Chevron Corp. v. Stratus Consulting, Inc.*, 2010 U.S. Dist. LEXIS 110023 (D. Colo. Oct. 1, 2010).

**C. The CFPB must be bound by its lack of evidence of consumer harm.**

Topics 14 and 15 of the Rule 30(b)(6) notice sought the following:

> *14. The basis for the CFPB's contention, if any, that any consumer was harmed in connection with the CFPB's allegations against the Borders, including the identity of the consumers and any facts, documents, witness statements, or testimony that the CFPB contends support its allegations.*

> *15. The basis for the CFPB's contention, if any, that the Borders or the Title LLCs charged above market prices for any settlement service in any transaction within the scope of the CFPB's allegations, and any facts, documents, witness statements, or testimony that the CFPB contends support its allegations.*

The Court's Order of June 29, 2016 held that the CFPB need not respond to Topics 14 and 15 based on the CFPB's representation that it did not intend to present evidence of consumer harm or above market pricing at trial and that consumer harm was "irrelevant" to its claims:

> *Obviously if the CFPB seeks to introduce into evidence proof that consumers were charged excessive amounts for settlement services, or other evidence of consumer harm, relevant to topics 14 and 15 a completely different result would be required. Under such circumstances the CFPB could not "have it both ways." It could not avoid Rule 30(b)(6) inquiry by the defendants based on the irrelevancy of consumer harm while simultaneously seeking to introduce evidence of exactly that—consumer harm—against the defendants at trial. In this regard we take the CFPB at its word, potential consumer harm is irrelevant to its RESPA claims and thus nondiscoverable.*

(DN119 at n.2).

At the Rule 30(b)(6) deposition, the Borders asked whether it remained the CFPB's position that consumer harm was irrelevant to its claims. The CFPB refused to answer:

> *Q. There's a reference to inflated real estate settlement costs in the second paragraph of this press release announcing the filing of this lawsuit, do you see that?*
>
> *A. Yes, I see a general statement that says " When companies pay kickbacks in exchange for referrals, it can hurt competition and inflate real estate settlement costs for consumers, while creating an uneven playing field that puts law-abiding businesses at a disadvantage" , yes, I see that statement.*
>
> *Q. But the CFPB is not contending that any of the settlement costs in this lawsuit were inflated.*
>
> *MS. IVEY-COLSON: Objection. I'm instructing the witness not to answer. Judge Whalin struck topics 14 and 15, which talk about alleged harm, as it's not relevant to any claim or defense in this case.*
>
> *Q. Based on the CFPB's representation that they are not going to contend at trial that any settlement costs were inflated, right?*
>
> *MS. IVEY-COLSON: Same objection. I'm instructing the witness not to answer.*
>
> *Q. So there will be no testimony at trial from any consumer claiming that they received inflated settlement cost?*

*MS. IVEY-COLSON: Same objection. Don' t answer.*

*Q. There will be no testimony at trial, will there, that competition was hurt?*

*MS. IVEY-COLSON: Same objection. Don' t - - don' t answer.*

(Melcher Depo. at 161-163).

Given the CFPB's position in response to the Rule 30(b)(6) notice, the CFPB must be bound to its lack of evidence of consumer harm and above-market pricing. This lack of evidence is dispositive as set forth in the Borders' summary judgment motion. In cases where, as here, the only payments challenged are for services actually received by the consumer, the CFPB bears the burden to show that payments exceeded the fair market value in order to sustain a claim that the payment was a "disguised" kickback. Otherwise, the payment is explicitly permitted by Sections 8(c)(1) and 8(c)(2) of RESPA, and Regulation X. 12 C.F.R. § 1024.14(g). The CFPB's burden on this issue is addressed extensively in the D.C. Circuit's recent decision in *PHH Corp. v. CFPB*, 839 F.3d 1, 44-45 (D.C. Cir. 2016). The D.C. Circuit called the CFPB's refusal to acknowledge its burden of proof on this issue as "nonsensical." *Id*. at 45.

## IV. CONCLUSION

An order binding the CFPB to its Rule 30(b)(6) testimony is necessary for the Borders to finally address and defeat the unfounded allegations that the CFPB has held over their business for years. For the foregoing reasons, the Borders respectfully request that the Court enter the attached order binding the CFPB's testimony on the topics addressed above.

Respectfully submitted,

*/s/ David B. Owsley II*________
T. Morgan Ward, Jr.
Richard A. Vance
David B. Owsley II
Michael Denbow
STITES & HARBISON PLLC
400 West Market Street, Suite 1800
Louisville, KY 40202-3352
*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

It is hereby certified that the foregoing was filed with the court via the CMF/ECF system on this 25th day of January 2017, which will provide notice of filing to all counsel of record.

*/s/ David B. Owsley II*___________
Counsel for Defendants

**LR 37.1 CERTIFICATION**

Undersigned counsel certifies pursuant to LR 37.1 that counsel for the parties conferred extensively on these issues and were unable to reach resolution. The efforts to address this dispute are detailed fully in the prior briefing (DNs 102, 106), that resulted in this Court's prior order on the issue during the discovery period (DN119).

*/s/ David B. Owsley II*__________
Counsel for Defendants