UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CONSUMER FINANCIAL PROTECTION
BUREAU                                                                           PLAINTIFF

v.                                                              CIVIL ACTION NO. 3:13-CV-01047-CRS

BORDERS & BORDERS, PLC, et al.                                                  DEFENDANTS

## **MEMORANDUM OPINION**

### I. Introduction

This matter is before the court on plaintiff Consumer Financial Protection Bureau's (hereinafter "the Bureau") motion for reconsideration of the court's July 13, 2017 order granting defendants' motion for summary judgment and denying plaintiff's motion for partial summary judgment. ECF No. 161. Defendants Borders & Borders, PLC, Harry Borders, John Borders, Jr., and J. David Borders (collectively "Borders & Borders") responded. ECF No. 164. The Bureau subsequently replied. ECF No. 165. For the reasons stated below, the court will deny the Bureau's motion for reconsideration.

### II. Factual Background

Borders & Borders is a law firm in Louisville, Kentucky that specializes in real estate law. ECF No. 128-3, p. 1. The law firm was founded in 1971 by J. David Borders. *Id.* His sons, David Borders, Jr. and Harry Borders, later joined him in practice. *Id.* at 2. Borders & Borders "has handled tens of thousands of Kentucky real estate closings," and is also "an authorized agent to issue title insurance policies in Kentucky." *Id.* at 1.

In 2006, Borders & Borders established nine joint ventures with various real estate agents and mortgage brokers in the Louisville market. *Id.* at 10. These joint ventures were title insurance agencies (hereinafter "Title LLCs") that could write policies for mortgage lenders and consumers. *Id.* Fifty percent of each Title LLC was owned by Borders & Borders, and the other fifty percent was owned by a corresponding joint venture partner or partners (hereinafter "JVPs"). *Id.*

Mortgage lenders typically require consumers to purchase a lender's title insurance policy to protect it against any title defects. ECF No. 129-30, p. 1. Although many mortgage lenders in the Louisville market have their own affiliated title insurance agencies, some do not. ECF No. 128-3, p. 10. When Borders & Borders served as the closing attorney for a real estate transaction where there was no captive lender agency involved, the law firm would refer the consumer to one of its Title LLCs for the provision of title insurance. ECF No. 129-36, p. 2. The particular Title LLC to which the consumer was referred depended on which JVP had served as the real estate agent or mortgage broker in the real estate transaction. *Id.* Borders & Borders provided each consumer with a disclosure statement at the time of referral, indicating that the Title LLC was jointly owned by Borders & Borders and the JVP and providing its standard rates. ECF No. 128-3, p. 16. The consumer then had thirty days from the closing to choose whether to purchase title insurance from the Title LLC or from another vendor. *Id.* From 2009 to 2011, the Title LLCs issued over 1,000 title insurance policies relating to over 700 real estate closings. *Id.*

On February 23, 2011, the Housing and Urban Development Office ("HUD") sent Borders & Borders a letter stating that they had initiated a Real Estate Settlement Practices Act (RESPA) investigation of the law firm's title insurance referrals. *Id.* at 19. HUD issued a Request for Information and Documents, to which Borders & Borders responded. *Id.*, ECF No. 129-5.

Then, on April 25, 2012, HUD advised Borders & Borders that the investigation would be transferred to the Bureau, and requested additional information and documents. ECF No. 128-3, p. 20.

On October 24, 2013, the Bureau filed suit against Borders & Borders, alleging that Borders & Borders arranged for the Title LLCs to pay distributions to the JVPs in exchange for closing services referrals in violation of section 8(a) of RESPA. 12 U.S.C. § 2607(a). ECF No. 1, ¶¶ 28-30. Both parties filed motions for summary judgment. ECF Nos. 128, 129. This court granted Borders & Borders' motion for summary judgment, and denied the Bureau's motion for partial summary judgment. ECF No. 158. The Bureau now moves this court to reconsider its decision. ECF No. 161.

III. Legal Standard

Under Federal Rule of Civil Procedure 59(e), a party may move to alter or amend a judgment within twenty-eight days of its entry. Rule 59(e) motions allow district courts to correct their own errors, "sparing the parties and appellate courts the burden of unnecessary appellate proceedings." *Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008). Granting a Rule 59(e) motion is appropriate when there is: "(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice." *Schlaud v. Snyder*, 785 F.3d 1119, 1124 (6th Cir. 2015) (citation omitted).

The Bureau asks this court to reconsider its ruling granting Borders & Borders' motion for summary judgment and denying the Bureau's motion for partial summary judgment. A trial court shall grant summary judgment in a case "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of

3

"demonstrating that [there is] no genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies this burden, the burden then shifts to the nonmoving party to "point to evidence demonstrating that there *is* a genuine issue of material fact for trial." *Id.* at 323 (emphasis added).

In considering a motion for summary judgment, the court must consider the facts in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There must actually be "evidence on which the jury could reasonably find for the [nonmoving] party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

IV. Discussion

The Bureau contends that this court incorrectly granted summary judgment in Borders & Borders' favor and denied its own motion for partial summary judgment. Specifically, the Bureau argues that while the court correctly concluded that Borders & Borders' referral scheme violated section 8(a) of RESPA, it incorrectly concluded that this referral scheme fell within the safe harbor afforded to 'affiliated business arrangements' under section 8(c)(4). The grounds for granting summary judgment in Borders & Borders' favor are reconsidered below.

A. Violation of Section 8(a) of RESPA

Section 8(a) of RESPA prohibits persons from giving or receiving "any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a). The purpose of this statute is to eliminate

4

"kickbacks and referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b)(2). To demonstrate a violation of section 8(a), a plaintiff must show: "(i) a payment of a thing of value; (ii) made pursuant to an agreement to refer settlement business; and (iii) an actual referral." *Egerer v. Woodland Realty, Inc.*, 556 F.3d 415, 427 (6th Cir. 2009). Additionally, the plaintiff must demonstrate that a federally related mortgage loan was at issue.

A 'thing of value' is defined in the statute as "any payment, advance, funds, loan, service, or other consideration." 12 U.S.C. § 2602(2). The statute's implementing regulation provides further guidance, stating that a 'thing of value' also includes:

> [M]onies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distribution of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity, special bank deposits or accounts, special or unusual banking terms, services of all types at special or free rates, sales or rentals at special prices or rates, lease or rental payments based in whole or in part on the amount of business referred, trips and payment of another person's expenses, or reduction in credit against an existing obligation. 12 C.F.R. § 1024.14(d).

This court previously determined that Borders & Borders paid the JVPs a 'thing of value' by "compensat[ing] [them] for their role in the management and/or ownership of the Title LLCs." Mem. Op., ECF No. 157, p. 8. Upon review of the facts and the parties' briefing, the court now believes that Borders & Borders did not give the JVPs any 'thing of value.' Rather, the consumers purchased title insurance from the Title LLCs, and the Title LLCs subsequently distributed profits from the sale of title insurance to the JVPs in accordance with their ownership interests in those Title LLCs.

In its initial briefing, the Bureau acknowledged that funds flowed from the consumers to the Title LLCs, but pointed out that the consumers bought the required title insurance from the

Title LLCs at the suggestion of Borders & Borders. The Bureau argued that Borders & Borders gave the JVPs a 'thing of value' when it "nominally assigned title insurance work to the Title LLCs, which resulted in premiums flowing to the Title LLCs and profits to the JVPs." Pl.'s Response, ECF No. 137, p. 5; Pl. Mot. Summ. J., ECF No. 129-1, p. 19. The court continues to believe that this "nominal assignment" is insufficient to constitute a 'thing of value' because consumers were not obligated to follow the suggestion of Borders & Borders. Indeed, consumers had thirty days after the closing to decide whether to use the Title LLC suggested by Borders & Borders, or to use a different title insurance underwriter. If the consumer chose to purchase insurance from another underwriter, the JVP involved with the case received nothing. This *potential* benefit is insufficient to constitute a 'thing of value' because it is entirely conditioned on the third-party consumer's choice.

Because the Bureau fails to demonstrate that Borders & Borders paid the JVPs a 'thing of value,' it is unnecessary to consider whether an agreement existed or whether there was an actual referral. The Bureau's claim that Borders & Borders violated section 8(a) of RESPA is not shown by the undisputed facts.

B. <u>Satisfaction of Safe Harbor Provision Under Section 8(c)(2)</u>

Even assuming *arguendo* that Borders & Borders did provide the JVPs a 'thing of value,' their conduct still does not constitute a violation of section 8(a) because of the safe harbor provisions in 8(c). The court previously relied on the safe harbor for 'affiliated business arrangements' under section 8(c)(4).[1] The court now finds that the safe harbor for 'payment for services actually performed' under section 8(c)(2) is the correct provision under these facts.

---

[1] The safe harbor provision in section 8(c)(4) states that "[n]othing in this section shall be construed as prohibiting . . . affiliated business arrangements so long as (A) a disclosure is made of the existence of such an arrangement to the person being referred . . . (B) such person is not required to use any particular provider of settlement services, and

RESPA section 8(c)(2) states that "[n]othing in this section shall be construed as prohibiting . . . payment for goods or facilities actually furnished or for services actually performed . . ." 12 U.S.C. § 2607(c)(2). A recent decision by the D.C. Circuit interpreting this provision is instructive. In *PHH Corporation v. CFPB*, 839 F.3d 1 (D.C. Cir. 2016), *reh'g en banc granted*, *rev'd on other grounds*, a mortgage lender, PHH, filed suit against the CFPB after the agency instituted an enforcement action against PHH resulting in a $109 million damage order against it. According to the CFPB, PHH violated section 8(a) of RESPA when it referred consumers to a mortgage insurer, and the mortgage insurer subsequently purchased reinsurance policies from PHH's subsidiary, resulting in profits flowing to PHH. *Id.* at 40. The D.C. Circuit disagreed, holding that PHH did not violate section 8(a) because the section 8(c)(2) safe harbor applied. *Id.* The Court determined that the mortgage insurer was not providing payments in exchange for referrals, but in exchange for reinsurance, which it *actually received*. *Id.* at 41. Although the Court acknowledged that "[PHH's] actions create[d] a kind of tying arrangement"—that is, PHH *only* agreed to refer consumers to a mortgage insurer *if* the mortgage insurer purchased reinsurance from PHH's subsidiary—the Court concluded that RESPA "does not proscribe [such] a tying arrangement, so long as the only payments exchanged are bona fide payments for services and not payments for referrals." *Id.* The Court explained that a payment is bona fide if it amounts to "reasonable market value" for the service provided. *Id.*

The present case is analogous to *PHH*. Here, consumers made payments to the Title LLCs, which subsequently distributed profits to the JVPs in accordance with their ownership interest. However, these payments were not made in exchange for referrals, but in exchange for title insurance, which the consumers *actually received*. These payments are presumed to be bona

---

(C) the only thing of value that is received from the arrangement . . . is a return on the ownership interest or franchise relationship . . ." 12 U.S.C. § 2607(c)(4).

7

fide because there is no evidence that the consumers paid above market value for the title insurance. Moreover, this arrangement is less controversial than the arrangement in *PHH*, because a third party, rather than the party receiving the consumer referrals, made the payment. The section 8(c)(2) safe harbor therefore applies.[2]

**Figure 1: *PHH Corporation v. CFPB***



**Figure 2: *CFPB v. Borders & Borders***



---

[2] Based on this conclusion, the court's prior application of the section 8(c)(4) safe harbor for 'affiliated business arrangements' is surplusage.

Finally, the court notes that application of the section 8(c)(2) safe harbor in this case does not contravene the purpose of RESPA. As previously stated, RESPA was enacted to prevent "kickbacks and referral fees that tend to increase unnecessarily the costs of certain settlement services." 12 U.S.C. § 2601(b)(2). Here, there were no kickbacks or referral fees. There was only payment by consumers for title insurance that they actually received. Further, the cost of settlement services for consumers was not increased. There is no evidence that Borders & Borders charged above market rate for their closing services, or that the Title LLCs charged above market rate for the provision of title insurance. In short, the consumers received exactly what they paid for. It makes no difference whether they received title insurance from a Title LLC co-owned by a JVP or from another title insurance agency.

## V. Conclusion

For the aforementioned reasons, the Bureau's motion for reconsideration of this court's order granting Borders & Borders' motion for summary judgment and denying the Bureau's motion for partial summary judgment will be denied. An order will be entered in accordance with this memorandum.

March 21, 2018

**Charles R. Simpson III, Senior Judge**
United States District Court